[No. 72919-1. En Banc.]
Argued June 9, 2005.     Decided October 6, 2005.

THE STATE OF WASHINGTON, *Respondent*, v. NATHAN DALLAS BRIGHTMAN, *Petitioner*.

*Kevin R. Cole*, for petitioner.

*Gerald A. Horne, Prosecuting Attorney*, and *John C. Hillman* and *Alicia M. Burton, Deputies*, for respondent.

¶1 BRIDGE, J. — Nathan Brightman seeks reversal of his conviction for the second degree murder of Dexter Villa. Brightman claims that his constitutional right to public trial was violated when the trial court closed the courtroom to spectators during jury selection. Brightman also argues that the trial court erred when it declined to give his proposed instruction on justifiable homicide.

¶2 We conclude that the trial court erred when it directed that the courtroom would be closed to spectators during jury selection, without fulfilling the requirements set forth in *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995). This error entitles Brightman to a new trial. Because the issue may arise again on retrial, we also conclude that the trial court did not err when it refused to give Brightman's proposed instruction on the defense of justifiable homicide.

I

Statement of Facts

¶3 On October 1, 1998, Brightman approached Villa in the parking lot of Tacoma Community College and asked him for a ride to Gig Harbor. Villa agreed, but instead of driving to Gig Harbor, the pair ended up at a parking area near Titlow Beach. According to three witnesses,[1] after Villa parked, the men began fighting inside the car. Then Brightman got out of the car and headed toward the driver's side. Villa jumped out of the car, and the fight continued. One witness testified that each man remained on his feet, and it seemed to be a fair fight. Another testified that Villa

---

[1] Two witnesses explained that they had been smoking crack for a couple of hours before going to the beach parking area where they witnessed the shooting. The third witness was painting a nearby house and had a bird's eye view of the parking area.

looked like he was trying to get away, but Brightman was holding onto Villa's shirt. The third testified that he saw Villa waive his hands in fear. Each witness saw Brightman shoot Villa. Brightman looked over at one of the witnesses in the parking lot, pulled his coat over his face, got in Villa's car, and drove away.

¶4 According to Brightman's testimony, when he and Villa were driving away from the community college, he gave Villa $7 for gas. The conversation turned to parties and drugs, and Brightman claims he gave Villa $20 to get him some marijuana. Villa then drove to the parking area near Titlow beach. After Villa parked, he ordered Brightman to get out of his car. Brightman replied that he wanted his money back. Villa leaned across him to open the passenger door, Brightman shoved his hand away, and a fight ensued. Brightman claims that he yelled " 'help me,' " tried to fight back, and eventually got out of the car. Report of Proceedings (RP) at 1081-82. Villa also got out of the car, and the fight continued. Brightman testified that both men threw punches and both stayed on their feet. Significantly, Brightman admitted that he resumed the fight once both men were outside of the car, and he had *no fear* of Villa during the fight.

¶5 Brightman claimed that he eventually drew a gun, intending only to club Villa with it. Brightman hit Villa with the gun twice, and the second time the gun went off. Villa fell to the ground and Brightman panicked. He testified that he had the clip in his pocket, and he did not know there was a bullet in the chamber. Brightman picked up his money, threw his coat over his face, got in Villa's car, and drove away.

¶6 Brightman drove across the Tacoma Narrows Bridge. He tossed the gun and the clip out of the sunroof and off the bridge. They were never recovered. A police officer testified that he tried to stop Brightman, and Brightman started to pull over but then sped away. Brightman parked the car on a gravel road, threw the keys in the bushes, and ran home. Later that night, Brightman's friends returned to Villa's car

and stole his stereo, CDs (compact discs), and other items. The police eventually connected Brightman to the shooting, and he was arrested. He was charged with premeditated first degree murder and, in the alternative, first degree felony murder based on robbery, on the theory that he was trying to steal Villa's car. He was also charged with unlawful possession of a firearm in the first degree.[2]

¶7 On the day before jury selection began, the court convened so that the defendant could enter a guilty plea on the charge of unlawful possession of a firearm. After accepting the plea, the court proceeded to deal with a number of "housekeeping" issues. The court discussed the trial schedule, admonished the attorneys not to try the case in voir dire, and ruled on the issue of leg restraints. Then the trial judge, sua sponte, told the attorneys:

> In terms of observers and witnesses, we can't have any observers while we are selecting the jury, so if you would tell the friends, relatives, and acquaintances of the victim and defendant that the first two or three days for selecting the jury the courtroom is packed with jurors, they can't observe that. It causes a problem in terms of security.
>
> When we move to the principal trial, anybody can come in here that wants to. It is an open courtroom.
>
> Any other problem?

RP at 19-20. Neither party objected, and defense counsel immediately asked the judge a question about an unrelated matter. The record reflects that there was no other discussion of the courtroom closure. Clerk's Papers (CP) at 147-48 (declaration of court reporter indicating that a review of her transcription of jury selection revealed no other reference to spectators being in the courtroom or being denied access to the courtroom).

¶8 A jury was selected and the case went to trial. At the close of evidence, the defense sought to have the jury instructed that "[h]omicide is justifiable when committed in

---

[2] Brightman had previously been convicted of assault in the second degree and burglary in the second degree, making it unlawful for him to carry a firearm.

the actual resistance of an attempt to commit a felony," CP at 30, and that "[r]obbery is a felony." CP at 26. The defense also proposed an instruction explaining that the use of force is lawful when someone reasonably believes he is about to be injured, so long as the force used is not more than necessary. CP at 32.[3]

¶9 The trial court did not give any of the defendant's proposed instructions on justifiable homicide or self-defense because the court concluded that the evidence did not support these instructions. *See* CP at 56-84. Instead, the trial court instructed:

> Under certain circumstances and conditions a homicide may be justifiable, that is one committed in self defense or in defense of a felony. As a matter of law such circumstances and conditions do not exist in this case. Therefore you may not consider justifiable homicide as a defense to the charge of Murder in the First Degree, Murder in the Second Degree, or Manslaughter in the First Degree.

CP at 80 (Instruction 23). Defense counsel objected to this instruction. The trial judge explained that because defense counsel had argued justifiable homicide in opening statements and questioned some witnesses about issues surrounding the justifiable homicide theory, the judge felt it necessary to explain to the jury that justifiable homicide was no longer an issue in the case.

¶10 Brightman was convicted by the jury of murder in the second degree. Brightman appealed, arguing that the trial court violated his right to a public trial by closing the courtroom during jury selection. *State v. Brightman,* 112 Wn. App. 260, 48 P.3d 363 (2002) (published in part); *State v. Brightman*, No. 25220-1-II, slip op. (unpublished portion) at 11 (Wash. Ct. App. June 21, 2002). The Court of Appeals noted that there is no evidence that the court enforced its

---

[3] Brightman also proposed an instruction explaining that homicide is justifiable when committed in self-defense so long as the slayer reasonably believed the person slain intended to inflict death or great personal injury, the slayer reasonably believed there was imminent danger of such harm being accomplished, and the slayer employed only such force as a reasonably prudent person would under the same or similar circumstances. CP at 51. However, he does not challenge rejection of this instruction on appeal.

ruling, there is no record of a written order, and there is nothing else in the record indicating that anyone was denied access to the courtroom. *Brightman,* slip op. at 12. Relying on *State v. Gaines,* 144 Wash. 446, 463, 258 P. 508 (1927), the Court of Appeals concluded that in the absence of a record reflecting actual closure, it would not presume that the courtroom was closed, and thus Brightman had not shown he was denied a public trial. The Court of Appeals, finding no reversible error, affirmed Brightman's conviction.

¶11 In his appeal Brightman also argued that the trial court erred in refusing to instruct the jury on justifiable homicide. *Brightman,* 112 Wn. App. at 264. Although Brightman admitted that he was never afraid of Villa, he claimed on appeal that when a homicide is committed in the actual resistance of an attempt to commit a felony upon the slayer, then the use of deadly force is per se reasonable. *See id.* at 266-67; RCW 9A.16.050(2). Brightman also argued that instruction 23 amounted to an improper comment on the evidence. *Brightman,* slip op. at 8-9. The Court of Appeals concluded that because Brightman's testimony showed that the shooting was accidental rather than intentional, the instruction on justifiable homicide was properly refused. *Brightman,* 112 Wn. App. at 264-65 (citing *State v. Kerr,* 14 Wn. App. 584, 585-86, 544 P.2d 38 (1975)). Additionally, the instructions were properly refused because the evidence did not show that Villa was attempting to commit a violent felony (Villa's alleged actions were instead theft by fraud followed by assault), but even if Villa was attempting to rob Brightman, not all robberies justify the use of deadly force. *Id.* at 267. Because Brightman did not fear great bodily harm or death, the use of deadly force was not reasonable here. *See id.* Finally, the Court of Appeals concluded that instruction 23 did not impermissibly comment on the evidence because the instruction accurately stated the law, and there was no evidence that Brightman justifiably shot Villa. *Brightman,* slip op. at 9.

¶12 Brightman petitioned for review in this court and review was deferred until the publication of our decision in

*In re Personal Restraint of Orange,* 152 Wn.2d 795, 100 P.3d 291 (2004), at which time we granted review.

II

Analysis

¶13 In this case, we determine whether the trial court committed reversible error by closing the courtroom to spectators during jury selection. We also consider whether the trial court erred when it refused to give the defendant's proposed instructions on justifiable homicide and instead gave an instruction indicating that as a matter of law, there was no justifiable homicide in this case.

■■ ¶14 *Closed Courtroom*: Article I, section 22 of the Washington Constitution and the sixth amendment to the United States Constitution both guarantee criminal defendants the right to a public trial. The public trial right serves to ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury. *Peterson v. Williams,* 85 F.3d 39, 43 (2d Cir. 1996) (citing *Waller v. Georgia,* 467 U.S. 39, 46-47, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984)). Whether a defendant's right to a public trial has been violated is a question of law, subject to de novo review on direct appeal. *See Bone-Club,* 128 Wn.2d at 256; *see also United States v. Al-Smadi,* 15 F.3d 153, 154 (10th Cir. 1994).

■ ¶15 In *Bone-Club*, without objection from the defendant, the trial court closed the courtroom during a pretrial suppression hearing that was necessary to decide the admissibility of the defendant's statements to police. 128 Wn.2d at 256-57. On direct appeal, the defendant claimed the temporary, full closure of the pretrial suppression hearing violated his right to a public trial under article I, section 22. *Id.* at 257. We held that the defendant's failure to object at trial to the courtroom closure "did not effect a waiver," neither did it free the court from having to consider

the defendant's public trial rights. *Id.* at 257, 261.[4] We also concluded that, in order to protect the defendant's right to a public trial, a trial judge may not close the courtroom without complying with the following five requirements:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

"5. The order must be no broader in its application or duration than necessary to serve its purpose."

*Id.* at 258-59 (alteration in original) (quoting *Allied Daily Newspapers v. Eikenberry,* 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).[5]

¶16 While the *Bone-Club* court addressed the complete closure of the courtroom for a pretrial suppression hearing, not jury selection, it is well settled that the right to a public trial also extends to jury selection. *Orange,* 152 Wn.2d at 804 (citing *Press-Enter. Co. v. Superior Court of Cal., Riverside County,* 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984)). This court has noted that a closed jury selection process harms the defendant by preventing his or her family from contributing their knowledge or insight to jury selection and by preventing the venire from seeing the interested individuals. *Orange,* 152 Wn.2d at 812. Thus, in order to support full courtroom closure during jury selection, a trial

---

[4] In *Bone-Club,* there was no dispute as to whether the courtroom was actually closed. 128 Wn.2d at 256.

[5] We have concluded that the *Bone-Club* requirements mirror the United States Supreme Court's Sixth Amendment public trial right analysis set forth in *Waller,* 467 U.S. at 45-47. *Orange,* 152 Wn.2d at 805-06; *Bone-Club,* 128 Wn.2d at 259-60.

court must engage in the *Bone-Club* analysis; failure to do so results in a violation of the defendant's public trial rights. *See id.* at 809.

¶17 In this case, the State does not dispute that the trial court failed to comply with the *Bone-Club* requirements before ruling that spectators would not be allowed in the courtroom during voir dire. The State contends, however, that before applying *Bone-Club* at all, this court should "look beyond the plain language of the [trial] court's ruling in order to determine the nature of the closure." Suppl. Br. of Resp't at 14. The State relies on *Orange,* in which this court looked to the nature of the closure before evaluating the trial court's compliance with the *Bone-Club* factors. *Orange,* 152 Wn.2d at 807. However, the *Orange* court defined the nature of the closure by looking *solely to the transcript of the trial court's ruling* to determine the presumptive effect of the closure order. *Id.* at 807-08. The majority ultimately refused to impose upon the defendant the burden of proving that the trial court's ruling was carried out. *Id.* at 813. Instead, "the very existence of the mandated order create[d] a strong presumption that the order was carried out in accordance with its drafting." *Id.* Thus, once the plain language of the trial court's ruling imposes a closure, the burden is on the State to overcome the strong presumption that the courtroom was closed.[6] Here, the State presents no evidence to overcome the presumption that closure in fact occurred.

¶18 The State also relies on *Gaines,* 144 Wash. 446, to support its argument that the defense should have to prove closure in fact.[7] However, as the *Orange* court reasoned, *Gaines* has since been superseded by *Waller* and *Bone-Club.*

---

[6] The *Orange* case was decided in the context of a personal restraint petition. But had this issue been raised on direct appeal, once the defense pointed to the trial court ruling in the record that purported to close the courtroom, the burden of showing that closure in fact did *not* occur would have rested with the State. *See Orange,* 152 Wn.2d at 814 (noting that appellate counsel would have succeeded had he or she raised the closed courtroom issue on direct appeal).

[7] The State makes an argument similar to the one presented in *Gaines,* asserting that the trial court's statement to the attorneys in this case did not amount to a ruling. However, the trial court made the relevant statement in the

*Orange,* 152 Wn.2d at 813. On appeal, a defendant claiming a violation to the public trial right is not required to prove that the trial court's order has been carried out. *Id.* at 813-14.

¶19 Finally, the State cites to cases that conclude that no infringement on the public trial right occurs where the closing is de minimis. Yet, it is clear that the guaranty of open criminal proceedings extends to the jury selection process. *Compare id.* at 804 (evaluating closure during jury selection) *with United States v. Ivester,* 316 F.3d 955, 959-60 (9th Cir. 2003) (evaluating closure during midtrial colloquy with jury after jurors raised courtroom security concerns). While some courts have concluded that limited seating by itself is not enough to violate a defendant's public trial right, requiring some affirmative act from the trial judge, *see, e.g., United States v. Shryock,* 342 F.3d 948, 974 (9th Cir. 2003), the trial court's ruling in this case clearly amounts to an affirmative act. In addition, the cases cited to exemplify trivial closures involve only brief and inadvertent closures. *See Peterson,* 85 F.3d at 42-43; *Al-Smadi,* 15 F.3d at 154-55; *Snyder v. Coiner,* 510 F.2d 224, 230 (4th Cir. 1975). Thus, even though a trivial closure does not necessarily violate a defendant's public trial right, the closure here was analogous to the closures in *Bone-Club* and *Orange.* The above cases cited by the State are distinguishable.

¶20 We conclude that based on the plain language of the trial court's ruling, there is a strong presumption that the court's directive in this case was carried out. *See Orange,* 152 Wn.2d at 813. The State has presented no evidence to overcome this presumption. Moreover, the defendant's failure to lodge a contemporaneous objection at trial did not effect a waiver of the public trial right.

course of pretrial "housekeeping," in which the judge decided several matters. RP at 17-20. The trial court gave clear instructions to the attorneys, and there is nothing to indicate that either the judge or the attorneys believed that compliance with the trial judge's directive was optional. RP at 19-20. Therefore, the argument that the trial court's statement in this case did not amount to a ruling is unconvincing.

*Bone-Club,* 128 Wn.2d at 257. Because the record in this case lacks any hint that the trial court considered Brightman's public trial right as required by *Bone-Club,* we cannot determine whether the closure was warranted. *Id.* at 261. Accordingly, we remand for a new trial. *See id.*

¶21 *Jury Instruction on Justifiable Homicide*: We also take this opportunity to resolve the issues surrounding certain jury instructions because they will likely recur on retrial. Brightman's version of the facts was that Villa needed money, that he talked Brightman into giving him $20 on the ruse that Villa would provide marijuana, and then Villa tried to eject Brightman from the car without producing the drugs. RP at 1338-39, 1341. Because Villa refused to return the money, a fistfight ensued. During the fight, Brightman drew his gun and clubbed Villa with it. RP at 1354. The gun *accidentally* discharged killing Villa. RP at 1354. Notably, Brightman testified that when he got out of the car and resumed the fight, he was not afraid of Villa. RP at 1153.

¶22 The trial court refused to give Brightman's proposed instructions on justifiable homicide. Instead the trial judge affirmatively told the jury, in instruction 23, that justifiable homicide was not a defense in this case as a matter of law. CP at 80.[8]

¶23 Brightman argues that rejection of his proposed instruction on justifiable homicide violated his rights under the Sixth and Fourteenth Amendments because the issue of justifiable homicide was properly raised and the State should have been required to prove absence of justification beyond a reasonable doubt. Brightman relies on two central arguments. First, he contends that when a defendant has

---

[8] As an initial matter, we question the wisdom of giving instruction 23 to the jury. We recognize that in *State v. Griffith,* 91 Wn.2d 572, 576, 589 P.2d 799 (1979), *State v. Nyland,* 47 Wn.2d 240, 244-45, 287 P.2d 345 (1955), and *State v. Hartley,* 25 Wn.2d 211, 226-27, 170 P.2d 333 (1946), this court approved similar instructions. We agree with those opinions to the extent that they hold that a simple statement of the law does not amount to a comment on the evidence. *See Hartley,* 25 Wn.2d at 227. However, in this case, we question the propriety of unnecessarily drawing the jury's attention to the defendant's failure to present sufficient evidence to support a justifiable homicide instruction.

acted in actual defense of an attempted violent felony, he or she need not show fear of great bodily harm or death in order to receive a justifiable homicide instruction. Second, he argues that a defendant is entitled to a justifiable homicide instruction where he or she acted with reasonable nondeadly force in self-defense but accidentally killed his or her attacker.

■ ¶24 Where a trial court has refused to give a justifiable homicide or self-defense instruction, the standard of review depends upon why the trial court did so. *State v. Walker,* 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). If the trial court's refusal is based on a factual dispute, then it is reviewable only for abuse of discretion. *Id.* If the court refused to give the instruction based on a ruling of law, then review is de novo. *Id.; see also, Castro v. Stanwood Sch. Dist. No. 41,* 151 Wn.2d 221, 224, 86 P.3d 1166 (2004) (reviewing question of statutory interpretation de novo). Here, Brightman does not challenge the factual conclusion that he did not fear Villa; he challenges only the trial court's legal conclusions regarding the justifiable homicide instruction. Therefore, our standard of review is de novo.

¶25 RCW 9A.16.050, Washington's justifiable homicide statute, reads:

Homicide is also justifiable when committed either:

(1) In the lawful defense of the slayer, . . . when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer . . . and there is imminent danger of that design being accomplished; or

(2) In the actual resistance of an attempt to commit a felony upon the slayer . . . .

In addition, RCW 9A.16.020, Washington's general self-defense statute, explains:

The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:

. . . .

(3) Whenever used by a party about to be injured ... in preventing or attempting to prevent an offense against his or her person, ... in case the force is not more than is necessary;

"Necessary" is defined for purposes of chapter 9A.16 RCW to mean "that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010(1).

¶26 A defendant is entitled to an instruction on justifiable homicide when he or she has raised some credible evidence, from whatever source, to establish that the killing occurred in circumstances that meet the requirements of RCW 9A.16.050. *See State v. Read,* 147 Wn.2d 238, 242, 53 P.3d 26 (2002); *Walker,* 136 Wn.2d at 772; *State v. McCullum,* 98 Wn.2d 484, 488, 656 P.2d 1064 (1983). The trial court must view the evidence from the standpoint of a "reasonably prudent person who knows all the defendant knows and sees all the defendant sees." *Read,* 147 Wn.2d at 242; *Walker,* 136 Wn.2d at 772. Thus, the court applies both an objective and a subjective test. *Read,* 147 Wn.2d at 242-43; *Walker,* 136 Wn.2d at 772. Once a defendant has raised some evidence to support an instruction on justifiable homicide, the State must prove absence of self-defense beyond a reasonable doubt. *State v. Acosta,* 101 Wn.2d 612, 616-17, 683 P.2d 1069 (1984); *McCullum,* 98 Wn.2d at 496. On the other hand, if no credible evidence appears on the record to support a claim of justifiable homicide, then the trial court must refuse to give a justifiable homicide instruction. *McCullum,* 98 Wn.2d at 488.

¶27 *Actual Defense of an Attempted Felony*: Brightman's arguments in this court focus on RCW 9A.16.050(2) (justifiable homicide based on actual defense against felony) and RCW 9A.16.020 (defining the lawful use of force). Brightman claims that although his killing of Villa cannot be justified under RCW 9A.16.050(1) because he did not fear Villa, it can be justified under RCW 9A.16.050(2). Brightman correctly notes that RCW 9A.16.050(1) contemplates justifiable homicide where the defendant reasonably

fears the person slain is *about to* commit a felony upon the slayer or inflict death or great personal injury, and there is *imminent* danger that the felony or injury will be accomplished. *See* 9A.16.050(1). In contrast, RCW 9A.16.050(2) considers a homicide justifiable where the defendant acted in *actual resistance* against an attempt to commit a felony on the slayer. *See* RCW 9A.16.050(2). Thus, RCW 9A-.16.050(2) addresses situations in which a felony or attempted felony is already in progress.[9]

¶28 Brightman argues that whenever the defendant can present evidence that a robbery was being attempted or was already in progress when the defendant acted in self-defense, then the defendant need not show that he or she feared death or great bodily injury to justify deadly force. However, Brightman concedes that even under RCW 9A.16.050(2), the court must evaluate whether the force used by the slayer was *reasonably necessary*. Suppl. Br. of Pet'r at 19 ("[T]his Court should interpret RCW 9A-.16.050(2) to apply to a slayer who kills another person when the slayer is actually resisting the other person's attempt to commit a felony against the slayer, *and the force the slayer intends to use is not more than necessary.*" (emphasis added)).

¶29 Justifiable homicide, and indeed all self-defense, is unmistakably rooted in the principle of necessity. Deadly force is necessary only where its use is objectively reasonable, considering the facts and circumstances as they were understood by the defendant at the time. *See* RCW 9A-

---

[9] The Court of Appeals concluded that there was no evidence that Villa was committing a robbery, reasoning instead that even if Villa acted as Brightman claimed, he committed theft by fraud, followed by simple assault. *Brightman,* 112 Wn. App. at 266. However, robbery occurs when force or fear is used to *retain* possession of property or to overcome resistance to the taking. RCW 9A.56.190. Robbery occurs when property that was handed over peaceably is unlawfully retained by force. *State v. Handburgh,* 119 Wn.2d 284, 291, 293, 830 P.2d 641 (1992) (noting that the legislature had *deleted* language establishing that the use of force merely as a means of escape did not constitute robbery). Here, Brightman testified that he gave Villa $20 peaceably, but then Villa attempted to eject Brightman from his car by force so that he could escape with the $20. Assuming the incident occurred as Brightman said it did, he presented some evidence that Villa was committing robbery under the statutory definition of the term.

.16.010; *Read,* 147 Wn.2d at 242, *Walker,* 136 Wn.2d at 772. For example, in *State v. Nyland,* this court held that adultery did not justify taking a human life:

> "The class of crimes in prevention of which a man may, *if necessary,* exercise his natural right to repel force by force to the taking of the life of the aggressor, are *felonies* which are committed by *violence and surprise;* such as murder, robbery, burglary, arson, . . . sodomy, and rape."

47 Wn.2d 240, 242, 287 P.2d 345 (1955) (first emphasis added) (quoting *State v. Moore,* 31 Conn. 479 (1863)). In all of these felonies, human life could be presumed to be in peril. *Id.* at 243. But the *Nyland* court also noted that "a killing in self-defense is not justified *unless* the attack on the defendant's person threatens life or great bodily harm." *Id.* (emphasis added).[10] Thus, the *Nyland* court contemplated an individualized determination of necessity, even where an attack on the defendant's person occurred. *See also State v. Griffith,* 91 Wn.2d 572, 576, 589 P.2d 799 (1979) ("A self-defense instruction, or a justifiable homicide instruction, is appropriate only where the slayer has used such force as is reasonably necessary *under the circumstances.*" (emphasis added)).

¶30 In *State v. Brenner,* Division One of the Court of Appeals read *Nyland* and *Griffith* to establish that even where a homicide is committed in defense of a felony or attempted felony, "the attack on the defendant's person [must threaten] life or great bodily harm." 53 Wn. App. 367, 377, 768 P.2d 509 (1989), *overruled on other grounds by State v. Wentz,* 149 Wn.2d 342, 68 P.3d 282 (2003). In *State v. Castro,* the defendant argued that where a violent felony was being committed, deadly force is justified, whether or not any other person would have acted similarly. 30 Wn. App. 586, 588-89, 636 P.2d 1099 (1981). But Division One

---

[10] Brightman claims that *Nyland* discusses the anticipation of imminent force or felony, implicating RCW 9A.16.050(1), but not .050(2). However, this language clearly refers to an *attack* that could threaten life or great bodily harm, *not fear or anticipation of an attack* that threatens life or great bodily harm. Thus, this language speaks to situations contemplated by RCW 9A.16.050(2), where a felony is underway or is being attempted.

disagreed, concluding that the very basis of the law of self-defense rests on the concept that

> "in resisting an attempt to commit a felony the person so resisting is not required to determine with absolute certainty what force is necessary for that purpose, but it does exact of him that *he shall not use any more force than shall seem to him to be reasonably necessary for that purpose.*"

*Id.* at 589-90 (quoting *State v. Harper,* 149 Mo. 514, 51 S.W. 89, 93 (1899)). We agree that RCW 9A.16.050(2) incorporates the concept that each act of deadly force must be reasonably necessary under the circumstances.

¶31 Brightman argues that reading RCW 9A.16.050(2) in this way renders .050(2) superfluous because it adds nothing to .050(1).[11] But fundamentally, Brightman himself concedes both that RCW 9A.16.050(2) should be informed by RCW 9A.16.020, the general self-defense statute, and that *each case* requires an evaluation of whether deadly force was necessary. Suppl. Br. of Pet'r at 19. The statutory definition of necessity, of course, requires an evaluation of reasonableness. RCW 9A.16.010(1).

¶32 The *Nyland, Griffith, Brenner,* and *Castro* cases support a conclusion that a justifiable homicide instruction based on *either* .050(1) or .050(2) depends upon a showing that the use of deadly force was *necessary under the circumstances.* All of these courts implied that an individualized determination of necessity is required, contradicting the notion that deadly force is per se reasonable whenever a robbery or other violent felony is attempted. Thus, a trial court may conclude, as a matter of law, that the use of deadly force was unreasonable where the defendant was attempting to recover a small amount of money from someone whom the defendant did not fear. *See State v. Madry,* 12 Wn. App. 178, 181, 529 P.2d 463 (1974) ("A small sum of money is not worth the injury to human life or even the threatening of such injury which results from the use of

---

[11] At least one Washington court has rejected this argument. *See Castro,* 30 Wn. App. at 589-90.

deadly force."). Because Brightman freely admitted that he did not fear Villa, we hold that the trial court was entitled to refuse to give a justifiable homicide instruction in this case.

¶33 *Claim of Accident*: In the alternative, Brightman argues that while he may not have been justified in using *deadly* force against Villa, he intended only to strike Villa with the gun, but the gun accidentally went off. In other words, Brightman claims he was using reasonable force to repel Villa by hitting him with the gun, and Villa's death was merely an unintended consequence.

¶34 Washington's excusable homicide statute reads:

Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, without criminal negligence, or without any unlawful intent.

RCW 9A.16.030. The Court of Appeals in this case concluded that where a homicide is accidental, the proper question presented to the jury is whether the homicide was *excusable* under RCW 9A.16.030, not whether it was *justifiable* under RCW 9A.16.050. *Brightman,* 112 Wn. App. at 265-66.

¶35 The Court of Appeals holding is consistent with *Kerr*. In that case, the defendant intended only to hold the victim at gunpoint until police arrived, but the gun accidentally went off. 14 Wn. App. at 586-87. Division Two held that "[j]ustifiable homicide implies an *intentional* act of killing which is, nevertheless, justified by exigent circumstances enumerated by statute." *Id.* at 587 (citing *State v. Clarke,* 61 Wn.2d 138, 377 P.2d 449 (1962); *New York Life Ins. Co. v. Jones,* 86 Wn.2d 44, 541 P.2d 989 (1975)). Because Kerr insisted that he did not intend to shoot, much less kill, it was apparent that Kerr was not relying on a justifiable homicide defense. *Id.* Instead, Kerr was arguing that the death was the result of accident or misfortune. *Id.* Thus, the trial court had properly refused to give an instruction on justifiable homicide. *Id.* at 587-88.

¶36 Similarly, in *State v. Baker*, 58 Wn. App. 222, 792 P.2d 542 (1990), the defendant admitted to brandishing a gun at his friend, Bryant, because Bryant was intoxicated and had been picking fights with Baker all day. *Id.* at 223. The gun accidentally discharged, killing Bryant. *Id.* at 224. Comparing the case with *Kerr*, Division One of the Court of Appeals held that Baker was not entitled to a justifiable homicide instruction because he never argued that he intentionally shot Bryant. *Id.* at 227.[12] In fact, Baker admitted that he never feared Bryant. *Id.* at 224.

¶37 The reasoning articulated in *Kerr* and *Baker* is founded in common sense. The legislature provided two defenses that are specific to homicides—justifiable homicide and excusable homicide. RCW 9A.16.050, .030. Excusable homicide is the defense that by its plain language is intended to apply to accidental killings, while justifiable homicide by its plain language applies to killings in self-defense. *Id.* While a defendant may take actions in self-defense that lead to an accidental homicide, one cannot actually kill by accident and claim that the homicide was justifiable. The proper defense for an accidental homicide is to argue that the homicide was excusable.[13]

---

[12] Other Court of Appeals cases have similarly noted that a homicide cannot be both justifiable and accidental. *See also State v. Hendrickson*, 81 Wn. App. 397, 399-400, 914 P.2d 1194 (1996) (recognizing that an unintentional killing can be excused through the defense of accident but cannot be justified through a claim of self-defense); *State v. Hanson*, 58 Wn. App. 504, 508, 793 P.2d 1001 (1990) (defense theories of intentional homicide by self-defense and accidental homicide were "diametrically opposed"); *State v. Stone*, 24 Wn. App. 270, 274, 600 P.2d 677 (1979) (noting that a theory that homicide was the result of self-defense was inconsistent with a theory that the gun went off accidentally).

[13] Even so, we note that a person's claim that he or she was acting in self-defense when the accident occurred is not irrelevant. *See State v. Callahan*, 87 Wn. App. 925, 932-33, 943 P.2d 676 (1997). Excusable homicide is available as a defense only where the slayer is "doing any lawful act by lawful means." RCW 9A-.16.030. In turn, RCW 9A.16.020(3) establishes that the use of force is lawful when the person is about to be injured, so long as the force used is not more than necessary. Thus, a defendant *could* argue that his action that precipitated the accidental killing amounted to lawful self-defense under RCW 9A.16.020(3), even if he could not argue that an accidental killing was a justifiable homicide under RCW 9A.16.050. This resolution is in accord with *Callahan,* where the Court of Appeals held that an act of self-defense could reasonably precipitate an accidental shooting. 87 Wn. App. at 932-33.

¶38 Fundamentally, Brightman's theory of the case was that he was using reasonable force to defend himself against Villa by striking him with the butt of a gun. As a result, the gun accidentally went off, killing Villa. Thus, Brightman's theory of the case involved self-defense, followed by excusable homicide. But Brightman did not present evidence to show that the homicide was *justifiable*. Brightman did not show that he *intentionally* used deadly force against Villa or that *deadly* force was necessary to defend himself. Thus, the trial court did not err in refusing to instruct the jury on justifiable homicide. If, on remand, Brightman argues that he committed an excusable homicide that was precipitated by an act of self-defense, then the trial court will have to evaluate whether he has raised sufficient evidence to support jury instructions on those issues.[14]

¶39 We conclude that the trial court did not err in refusing to instruct the jury on justifiable homicide.[15]

## III

## Conclusion

¶40 The trial court in this case ruled that spectators would be excluded from the courtroom during jury selection. On appeal there is a strong presumption that the trial court's directive was carried out and the courtroom closure occurred and here the State offers no evidence to overcome this presumption. Because the trial court failed to comply

---

[14] Although the trial court rejected a general self-defense instruction in this case, it did so in the context of a defense centered around justifiable homicide, not excusable homicide. If the trial court determines on remand that an instruction on excusable homicide is warranted, it may also reconsider whether a related instruction on general self-defense is warranted. We note that an excusable homicide instruction is proper *only* if the defendant was acting lawfully when the homicide occurred. RCW 9A.16.030. Whether Brightman is entitled to such an instruction is an issue for the trial court on remand, should Brightman request an excusable homicide instruction on retrial.

[15] Brightman also argues that the prosecutor committed misconduct when cross-examining him, but because we remand for a new trial, we need not address this issue.

with the *Bone-Club* closure requirements before closing the courtroom, Brightman's right to a public trial was violated. We reverse the Court of Appeals on this issue and remand for a new trial consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.