IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,               )
                                   )      No. 31215-1-III
          Respondent,              )
                                   )
     v.                            )
                                   )
SHELLY L. STARK,                   )      PUBLISHED OPINION
also known as SHELLYE L. STARK,    )
                                   )
          Appellant.               )

BROWN, J. — Shellye Stark appeals her first degree murder conviction, mainly

contending the trial court erred by denying her a public trial when asking spectators not

to come and go during closing arguments to avoid disruption. We conclude no closure

occurred. She next contends the court erred in allowing impermissible opinion

evidence.[1] We disagree. Finally, the State correctly concedes the court erred when

imposing a community custody condition requiring Ms. Stark to undergo a mental status

evaluation because under RCW 9.94B.080, it is unsupported in the record. We remand

---

[1] We do not consider Ms. Stark's pro se statement of additional grounds for
review on the same subject because under RAP 10.10(a) her appellate counsel has
provided adequate briefing.

for the trial court to strike the community custody condition. *See State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008). Accordingly, we affirm and remand.

FACTS

Early on December 9, 2007, Ms. Stark shot and killed her estranged husband Robert Stark at their Spokane home.[2] This court overturned her earlier first degree murder conviction because sufficient evidence did not support the trial court's jury instructions. *State v. Stark*, 158 Wn. App. 952, 244 P.3d 433 (2010). Generally, at her second trial on the same charge, Ms. Stark related the shooting followed a history of physical and emotional abuse by Mr. Stark. She asserted self-defense, claiming he attacked her shortly after he had been served with divorce papers.

Ms. Stark left Mr. Stark months before these events. Once a month, when Mr. Stark was away, Ms. Stark would return to Spokane to be with her son, Chris. In December 2007, Ms. Stark returned to Spokane intending to serve Mr. Stark with divorce papers she thought were more equitable than an earlier arrangement. Ms. Stark obtained a temporary restraining order and planned to serve Mr. Stark at their Spokane home. Anticipating an angry response from Mr. Stark, Ms. Stark asked her sister, Jacquette Johnson, to bring her a gun, however, Ms. Johnson was injured in an accident when driving to Spokane with a pistol and shotgun. Ms. Johnson was taken to a Spokane hospital. An officer released the pistol and shotgun to Ms. Johnson's son, Dale.

---

[2] We use first names of same surname witnesses to avoid confusion.

2

On December 8, Dale gave the unloaded pistol to Ms. Stark and agreed to serve Mr. Stark with the restraining order that night. Dale, Chris, and Ms. Stark went to the Starks' home to wait for Mr. Stark. While Chris slept on the couch, Ms. Stark talked with Dale. As they talked, the gun, by then loaded, sat on the kitchen table. According to Dale, the plan was for him to serve Mr. Stark with the restraining order outside and then take Chris back to the hospital while Ms. Stark would remain at the residence to ensure Mr. Stark did not return. Ms. Stark anticipated Mr. Stark would return home around 3:00 a.m., but he returned home at 1:00 a.m., surprising Dale, Chris, and Ms. Stark.

Mr. Stark asked, "'Shellye, what are you doing here?'" Report of Proceedings (RP) at 321. Dale walked passed Mr. Stark towards the door and asked him to step outside where he planned to serve the restraining order. Mr. Stark refused. Ms. Stark told Dale to just serve him while he was inside the house. Dale did and told Mr. Stark to leave the house and give him his car keys. Surprised, Mr. Stark asked Chris if he knew anything about this. Chris froze. From the kitchen, Ms. Stark told Chris and Dale to get out of the house. Seconds later, as Chris and Dale began down the steps they heard gunshots.

According to Ms. Stark, after Chris and Dale left, Mr. Stark angrily charged into the kitchen threatening to kill her. Mr. Stark reached and possibly touched a knife left on the counter when Ms. Stark pulled the gun she had hid behind her back, aimed, and fired three times. Ms. Stark tried to step over Mr. Stark, but he kicked her as she did. Then, Ms. Stark, in fear, fired the gun until it was empty. Ms. Stark called 911.

3

At least five shots hit Mr. Stark, four in the back. Detective Kip Hollenbeck interviewed Ms. Stark at the police department, reading her rights at 3:09 a.m. that morning. Ms. Stark ended the interview at 3:21 a.m., but according to the detective, before that, she related she shot Mr. Stark when he looked at the knife. And, Ms. Stark never told the detective Mr. Stark touched or grabbed the knife she had left on the counter, a position she later took at trial. Focusing on this discrepancy, defense counsel asked the detective during his rebuttal testimony whether it was possible Ms. Stark did not mention Mr. Stark touching the knife because the interview lasted but 12 minutes. Ms. Stark now challenges Detective Hollenbeck's testimony and the following follow up exchange as improper opinion testimony on her guilt or veracity:

> Q: So there were probably a lot of things that you were not told that morning by Ms. Stark?
> A: That's accurate, yes.
> Q: So, not having mentioned the knife is just one of them, possibly?
> A: Well, she told me that he looked at the knife and she thought he was going to go for the knife, so she took out her gun and shot him.
> Q: Fair enough. Isn't it common in many situations you interview an individual multiple times before you actually take a complete statement?
> A: It depends on the scenario. But, yes, we get as many interviews as we can to collect as much information as we can.
> Q: And the process, when you finally give somebody their rights, that last statement may be much more detailed?
> A: It depends on the individual and what she wants to tell us.
> Q: And the officer?
> A: Well, the officer is trying to glean information. It's not up to us what we are being told. We're hoping that it's the truth, but –
> Q: Isn't part of the purpose that the repeated interviews is to get the information so that when you get the final statement, it has everything that you believe is necessary?
> A: I'm not sure I understand your question. What I believe you're asking me is if what we typically do, if a participant is willing, we'll talk to them as much as we can, because any information we get is helpful. In this case, we weren't afforded that opportunity.

4

No. 31215-1-III
*State v. Stark*

Q: And at the point where the conversation was terminated -- let me make sure I don't ask this confusing, so give me a minute to form it. I'm assuming there had not been a lot of rapport established to where conversation could be more free-flowing. Obviously, it stopped rather abruptly?

A: Shellye Stark told me what she wanted me to hear and then the conversation was ended.

[Defense counsel]: Objection, Your Honor. I would ask that be stricken. That's an opinion.

The Court: I'm not going to strike it. I mean, you can ask him to clarify it. I'm not striking it. Your objection is preserved.

[Defense counsel resuming questioning]: You knew what was in Ms. Stark's mind?

A: No, I didn't know what was in her mind.

Q: So what you know is what she told you?

A: Yes.

RP 785-87.

Regarding Ms. Stark's closed courtroom and public trial concerns, the trial court stated before closing arguments:

I ask all the spectators, I don't really want people coming or going during closings, so if you don't think you can last the morning, you might want to rethink being in here, unless you really need to. It's just very disruptive.

RP at 891.

The jury found Ms. Stark guilty of first degree murder and specially found she had been armed with a firearm leading to a minimum of 300 months' confinement. She was ordered to undergo an evaluation for mental health treatment. Ms. Stark appealed.

ANALYSIS

A. Public Trial

The issue is whether the trial court erred by violating Ms. Stark's public trial rights when cautioning the spectators not to be disruptive by coming or going during closing

5

arguments. Ms. Stark contends the trial court's statement to spectators before closing arguments amounted to a closure. We review alleged public trial violations de novo. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012) (citing *State v. Easterling*, 157 Wn.2d 167, 173-74, 137 P.3d 825 (2006)).

Defendants have a constitutional right to a public trial. CONST. art. I, § 22; U.S. CONST. amend VI. While our Supreme Court has not considered whether the public trial rights under the state and federal constitutions are co-equal, "The Washington Constitution provides at minimum the same protection of a defendant's fair trial rights as the Sixth Amendment." *State v. Bone-Club*, 128 Wn.2d 254, 260, 906 P.2d 325 (1995).

"A public trial helps assure that the trial is fair; it allows the public to see justice done, and it serves to hold the justice system accountable." *Wise*, 176 Wn.2d at 17 (citing *Waller v. Georgia*, 467 U.S. 39, 46, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984)). "'Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.'" *Waller*, 467 U.S. at 46 n.4 (quoting *Estes v. Texas*, 381 U.S. 532, 588, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965) (Harlan, J., concurring)).

"[W]hile openness is a hallmark of our judicial process," a defendant's right to a public trial sometimes must give way to other rights and considerations. *Wise*, 176 Wn.2d at 9, 10 (citing *Waller*, 467 U.S. at 45, 48 (noting "'the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information'" and "'privacy of persons not before the court'"); *see, e.g., State v. Momah*, 167 Wn.2d 140,

6

152, 217 P.3d 321 (2009) (noting the right to an impartial jury); *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 55-56, 615 P.2d 440 (1980) (noting pretrial publicity of a suppression hearing may prejudice a defendant's fair trial right)). In *Bone-Club*, our Supreme Court "enumerated five criteria that a trial court must consider on the record in order to close trial proceedings to the public." *Wise*, 176 Wn.2d at 10 (citing *Bone-Club*, 128 Wn.2d at 258-59).

> 1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
> 2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
> 3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> 4. The court must weigh the competing interests of the proponent of closure and the public.
> 5. The order must be no broader in its application or duration than necessary to serve its purpose.

*Bone-Club*, 128 Wn.2d at 258-59 (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)) (citing *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 36-39, 640 P.2d 716 (1982); *Kurtz*, 94 Wn.2d at 62-65).

A defendant whose trial is closed without considering the *Bone-Club* factors has been deprived of his or her public trial right. Such a deprivation "is a structural error presumed to be prejudicial." *Wise*, 176 Wn.2d at 14 (citing *Easterling*, 157 Wn.2d at 181; *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 814, 100 P.3d 291 (2004); *Bone-Club*, 128 Wn.2d at 261-62). The remedy is a new trial. *See, e.g., Wise*, 176 Wn.2d at 14-15, 19; *State v. Paumier*, 176 Wn.2d 29, 35-37, 288 P.3d 1126 (2012).

We first decide if the trial court's statement before closing arguments amounted to a closure. "[A] closure 'occurs when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave.'" *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012) (quoting *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)). Contrary to Ms. Stark's closure contention, the State aptly argues the court asked that present spectators remain in court for the duration of the closing statements but, if they could not, to exercise good judgment in leaving from and returning to the courtroom.

Closures have been found when the public was fully excluded from the proceedings, when voir dire was closed to all spectators, when jurors were privately questioned in chambers, and when a co-defendant, his counsel, and all spectators were excluded from the courtroom while a separate co-defendant plea bargained. *Bone-Club*, 128 Wn.2d at 257; *Orange*, 152 Wn.2d at 807-08; *State v. Brightman*, 155 Wn.2d 506, 511, 122 P.3d 150 (2005); *Easterling*, 157 Wn.2d at 172; *Momah*, 167 Wn.2d at 146. Our Supreme Court held no court closure occurred when a defendant's daughter was excluded from court. *Lormor*, 172 Wn.2d at 93.

Here, like in *Lormor*, our focus is whether the plain language of the trial court's request "completely and purposefully closed [the courtroom] to spectators so that no one may enter and no one may leave." *Lormor*, 172 Wn.2d at 93. Contrary to Ms. Stark's arguments, the court's choice of language suggests the court did not "completely" or "purposefully" close the proceedings. *Lormor*, 172 Wn.2d at 93. First, the court did not tell spectators they could not come and go. The court "ask[ed] all

8

spectators" not to come and go during the closings. RP at 891. Generally, we reason a request to minimize disruptive behavior is not a closure. Second, even assuming the court's request indicated an intent to close the court, it would not be a complete closure. The court directed its request solely to those who "don't think [they] can last the morning." RP at 891. Third, and most important, the court expressly permitted spectators to come and go if they "really needed to." RP at 891.

Considering all, we reason the court did not intend to close the court. Instead, we conclude the court's purpose was, as it explained, limiting disruption. Accordingly, we hold the trial court did not violate Ms. Stark's public trial rights and, therefore, did not err when admonishing the spectators to limit disruptive behavior.

## B. Detective Hollenbeck's Testimony

The issue is whether the trial court erred when refusing to strike Detective Hollenbeck's response to Ms. Stark's counsel during rebuttal cross-examination. Ms. Stark contends the detective impermissibly opined on her guilt or veracity when testifying, "Shellye Stark told me what she wanted me to hear and then the conversation was ended." RP at 786. We review the court's decision to admit or exclude evidence for an abuse of discretion. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). A court abuses its discretion when its decision is manifestly unreasonable or is based on untenable reasons or grounds. *State v. Montgomery*, 163 Wn.2d 577, 597, 183 P.3d 267 (2008).

"Generally, no witness may offer testimony in the form of an opinion regarding the veracity of the defendant. Such testimony is unfairly prejudicial to the defendant

9

because it invades the exclusive province of the jury." *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). To determine if a witness's testimony constitutes improper opinion testimony, we consider the type of witness, the specific nature of the testimony, the nature of the charges, the type of defense, and other evidence before the trier of fact. *Montgomery*, 163 Wn.2d at 591. When it is a police officer who opines impermissibly, it "raises additional concerns because 'an officer's testimony often carries a special aura of reliability.'" *State v. Rafay*, 168 Wn. App. 734, 806, 285 P.3d 83 (2012) (quoting *Kirkman*, 159 Wn.2d at 928)).

Charged with first degree murder, Ms. Stark contends she shot her husband in self-defense. She argues Detective Hollenbeck "essentially testified that [her] self-defense claim was fabricated." Appellant's Br. at 13. The State points out the detective did not "directly" comment on the defendant's guilt or veracity. Resp't's Br. at 9-10. The State argues Detective Hollenbeck's testimony was a permissible statement based on an inference from the evidence gained from his interview with Ms. Stark. Testimony based on inferences from the evidence do not constitute impermissible opinion testimony when the witness "does not comment directly on the defendant's guilt or on the veracity of a witness, and is otherwise helpful to the jury." *Rafay*, 168 Wn. App. at 806 (citing *City of Seattle v. Heatley*, 70 Wn. App. 573, 578, 854 P.2d 658 (1993)).

Detective Hollenbeck's testimony is not impermissible opinion testimony because he properly offered an inference gleaned from his interview, and the answer was responsive to defense interrogation during rebuttal cross-examination. The detective testified on direct-examination that in his interview with Ms. Stark, she did not mention

10

Robert grabbed the knife. On cross, Ms. Stark's attorney attempted to elicit testimony explaining why she may have omitted this detail. The detective drew a permissible inference that Ms. Stark told him what he wanted to hear in his interview and was responsive to the question asked.

"The fact that an opinion encompassing ultimate factual issues *supports* the conclusion that the defendant is guilty does not make the testimony an improper opinion on guilt." *Heatley*, 70 Wn. App. at 579 (emphasis in original). "'[I]t is the very fact that such opinions imply that the defendant is guilty which makes the evidence relevant and material.'" *Id.* (quoting *State v. Wilber*, 55 Wn. App. 294, 298 n.1, 777 P.2d 36 (1989). Thus, the challenged testimony is not improper because it is an inference based on evidence. Therefore, Detective Hollenbeck did not directly comment on Ms. Stark's guilt or veracity. Accordingly, we conclude the trial court did not err in its evidence ruling.

Affirmed and remanded.

Brown, J.
_____
Brown, J.

11

No. 31215-1-III

SIDDOWAY, C.J. (concurring) — As discussed by the lead opinion, we presently have a bright-line standard for determining when a courtroom is closed for public trial purposes: a closure occurs "'when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave.'" *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012) (quoting *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)). I write separately to emphasize the importance of preserving that bright-line definition of closure from encroachment by a constitutional "right to feel welcome" suggested by my dissenting colleague.

"It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." *Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). The failure to preserve and maintain the decorum of the courtroom, according to legal procedures, may jeopardize a defendant's right to an impartial jury and warrant the granting of a mistrial. *State v. Crawford*, 21 Wn. App. 146, 150, 584 P.2d 442 (1978). These important values of due process and respect for the rule of law are safeguarded by Washington courts' historic authority, both inherent and as recognized by statute since 1909, to preserve and enforce

order in the courtroom and to provide for the orderly conduct of proceedings. *See* RCW 2.28.010; *Lormor*, 172 Wn.2d at 93-94.

My dissenting colleague is concerned with the law abiding citizen who will "take precautions not to displease a judge" and, incapable of honoring a court's request and unable to distinguish it from an order, will leave a trial that he wanted to attend. Dissent at 3. I question how many citizens are that timid. But more importantly, I question how a trial court can possibly be expected to control proceedings if it has to worry that even a reasonable request might make some observer feel uncomfortable and unwelcome.

I am more concerned with a trial court's ability to ensure a fair trial for the parties and respect for the court when faced with courtroom observers who are intentionally or unintentionally disruptive. Distracting or disruptive behavior can be exhibited in a number of situations: for example, by family, friends, or gang associates of criminal defendants or their victims; by partisans in contentious litigation; or by citizens passionately interested in a politically or emotionally charged high profile case. I am continually impressed by the patience and dignity shown by our trial courts in dealing with such behavior. Ultimately, however, when faced with disruption or the risk of disruption, the way that a trial court makes sure that spectators will continue to "respect the robe as a source of authority" (to quote my colleague) is by exercising authority— even if it makes some of those in attendance feel unwelcome. Dissent at 3.

2

Analyzing the trial court's request in this case as courtroom management rather than as a closure, as *Lormor* says we should, *see* 172 Wn.2d at 96, does not immunize the court's actions from review. As explained in *Lormor*, a trial court's requests that courtroom observers behave in particular ways is subject to review for abuse of discretion.

In short, to say of a public trial that "all are welcome"—while a nice turn of phrase—elevates an observer's right to attend a trial over a criminal defendant's right to due process and the public's interest in court proceedings characterized by dignity, order, and decorum. Dissent at 3. It is more accurate to say that all are welcome who will try to abide by standards of behavior reasonably imposed to ensure the proper administration of justice. Nothing about that offends the United States or Washington Constitutions.

Siddoway, C.J.

3

No. 31215-1-III

FEARING, J. (dissenting) — I part ways from my colleagues in two respects. First, I do not deem the trial court's comments to courtroom guests about leaving the courtroom to be precatory. Second, Washington, unlike other states and some federal courts, does not recognize any closures of a courtroom to be "trivial." Remand for a new trial has serious consequences that should cause an appeals court to pause before ordering a new trial. With a reversal, Spokane County would bear the extraordinary expense of a new trial for a second time. Nevertheless, I conclude that Washington precedence and American ideals of openness demand a reversal of the conviction of Shellye Stark. Therefore, I politely dissent.

The Sixth Amendment to the United State Constitution, applicable to the states through the Fourteenth Amendment due process clause, directs, in relevant part, that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." *In Re Oliver*, 333 U.S. 257, 267, 68 S. Ct. 499, 92 L. Ed. 2d 682 (1948). Washington's Constitution contains two corollary provisions. Article I, section 10 of the Washington Constitution reads, "Justice in all cases shall be administered openly, and without unnecessary delay." This provision entitles the public and the press, as representatives of the public, to openly administered justice. *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 848 P.2d 1258 (1993); *Cohen v. Everett City Council*, 85 Wn.2d 385, 388, 535 P.2d 801 (1975). Article I, section 22 of the Washington

Constitution provides, in pertinent part, "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial." These constitutional provisions arise from the guarantee of open judicial proceedings being a fundamental part of Anglo-American jurisprudence since the common law. *Richmond Newspapers, Inc. v. Va.*, 448 U.S. 555, 573 n.9, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980); *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 65, 615 P.2d 440 (1980) (Utter, J., concurring and dissenting). America had a tradition of open criminal trials that preceded drafting of the Bill of Rights. *Seattle Times v. Ishikawa*, 97 Wn.2d 30, 35-36, 640 P.2d 716 (1982).

The majority rules the trial court's comments did not violate Shellye Stark's public trial rights. The trial court stated before closing arguments:

> I ask all the spectators, I don't really want people coming or going during closings, so if you don't think you can last the morning, you might want to rethink being in here, unless you really need to. It's just very disruptive.

Report of Proceedings (RP) at 891. The majority considers the court's words as a request. The majority writes, "Contrary to Ms. Stark's closure contention, the State aptly argues the court asked that present spectators remain in court for the duration of the closing statements but, if they could not, to exercise good judgment in leaving from and returning to the courtroom." Majority at 8.

The State's argument places "spin" on the trial court's comment. If one reads the statement as a whole, the court tells spectators he does not want them "coming or going during closings [closing statements]." RP at 891. The court directs the spectators to

2

"rethink being in here." RP at 891. A reasonable listener would consider the comment to direct her to leave the courtroom if she cannot stay until a recess. Nowhere in the court's comments does the judge encourage a spectator to exercise good judgment when leaving or reentering. Instead, the gist of the trial court's remarks is to criticize and disapprove of any exit or entrance during proceedings as "very disruptive." RP at 891.

With his remarks, perhaps the trial court was allowing a spectator to exit and reenter the court if the spectator "really need[ed] to." RP at 891. If so, the court divided the gallery between those who needed to be present and those who did not need to present. Nevertheless, Washington does not afford an open court only to those who "really need to" be present. RP at 891. All are welcome.

The majority diminishes the gravity of the judge's remarks when characterizing the comments as a "request," not a closure. An overwhelming majority of spectators respect the robe as a source of authority and, when in doubt, will take precautions not to displease a judge. Reasonable spectators would interpret the trial court's remarks as a directive to leave the courtroom, before closing statements begin, if unable to remain until the next recess. Law abiding citizens do not distinguish between a judge's "request" and a court's "order."

The majority principally relies upon *State v. Lormor*, 172 Wn.2d 85, 257 P.3d 624 (2011), but omits the unique facts behind this decision. The *Lormor* trial court excluded only one spectator from the trial, the defendant Dean Lormor's four-year old daughter.

3

The daughter was terminally ill, confined to a wheelchair, and required a ventilator to breathe. The trial court excluded the daughter from the courtroom for a number of reasons. At her age, she possessed limited understanding of the proceedings. With the courtroom layout, the judge could hear at the bench the daughter's ventilator operating, and he concluded the noise would distract the jury. Third, the daughter needed to occasionally express herself to gain assistance. *Lormor* has no bearing to the instant case when our trial court told all observers he did not want anyone coming or going during closing arguments.

The Court of Appeals had held the exclusion of Dean Lormor's daughter to be a "trivial closure." *State v. Lormor*, 154 Wn. App. 386, 224 P.3d 857 (2010). The Supreme Court rejected this intermediary court's ruling and reliance on a "trivial" exception to the constitutional right. The court noted that the "trivial" standard articulated by federal circuit courts relies in most cases on an inadvertent act, which was not the situation with the exclusion of Lormor's daughter. Nor is it our situation.

A "closure" of a courtroom occurs when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave. *State v. Lormor*, 172 Wn.2d 85, 93 (2011). The trial court below may not have locked spectators in or out of the courtroom, but the trial court's authority imposed pressure upon observers to neither leave nor enter. Those who bowed to the pressure were purposefully barred from entering or leaving the courtroom.

4

Although our courts have discussed *de minimis* violations, Washington courts have never approved trivial violations of this constitutional right. *State v. Strode*, 167 Wn.2d 222, 230, 217 P.3d 310 (2009); *State v. Easterling*, 157 Wn.2d 167, 180, 137 P.3d 825 (2006); *Brightman*, 155 Wn.2d at 517; *State v. Leyerle*, 158 Wn. App. 474, 485, 242 P.3d 921 (2010). In each of the four decisions, the Supreme Court rejected arguments of the State that a closure was trivial. It is the trial court's obligation to take every reasonable measure to accommodate public attendance at criminal trials, and absent that court's consideration of alternatives to closure, it may not constitutionally close the court. *Leyerle*, 158 Wn. App. at 485 (citing *Presley v. Georgia*, 558 U.S. 209, 215, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010)).

We have no evidence, on appeal, that any court official below closed the courtroom door or that anyone left the room because of the trial court's comments. Nevertheless, Shellye Stark has no burden of proving exclusion of a specific person.

*Brightman*, 155 Wn.2d 506 (2005) should control our outcome. Nathan Brightman was convicted of second degree murder. At the beginning of voir dire, the trial court announced to the attorneys that he would not allow spectators in the courtroom, because the room would be packed with jurors. This appeals court rejected Brightman's argument that his right to a public trial had been violated. We noted that there was no evidence that the court enforced the ruling, there was no record of a written order, and there was nothing in the record confirming that anyone was denied access to

the courtroom. The state Supreme Court reversed and remanded for a new trial. The high court answered that once the plain language of the trial court's ruling imposes a closure, the burden switches to the State to overcome the strong presumption that the courtroom was closed. The State presented no evidence to overcome the presumption. A defendant claiming a violation of the public trial right is not required to prove that the trial court's order was carried out. *Brightman*, 155 Wn.2d at 517. In *In re Pers. Restraint of Orange*, 152 Wn.2d 795, the court also rejected an argument that the defendant must show that a trial court order was followed.

A violation of the public trial right is necessarily presumed prejudicial requiring a new trial. *Easterling*, 157 Wn.2d at 181; *State v. Bone-Club*, 128 Wn.2d 254, 261, 906 P.2d 325 (1995). "The right to a public trial is a unique right that is important to both the defendant and the public." *State v. Paumier*, 176 Wn.2d 29, 37, 288 P.3d 1126 (2012). Assessing the effects of a violation of the public trial right is often difficult, such that requiring a showing of prejudice would effectively create a wrong without a remedy. *Paumier*, 176 Wn.2d at 37. Therefore, a *Bone-Club* violation is not subject to harmless error analysis. *State v. Wise*, 176 Wn.2d 1, 14, 288 P.3d 1133 (2012).

We recognize that any one deprivation of the public trial right will not likely devastate our system of justice or even necessarily cause a particular trial to be unfair. *Wise*, 176 Wn.2d at 17. But letting a deprivation of the public trial right go unchecked in one case affects the framework within which other trials proceed. *Wise*, 176 Wn.2d at

6

17-18. To allow such deprivations would, over time, erode our open, public system of justice and could ultimately result in unjust and secret trial proceedings. *Wise*, 176 Wn.2d at 18. The constitution frequently demands exactitude and often interferes with expediency and economy.

Justice Tom Chambers best explained the importance of an open courtroom, in his concurring opinion in *Easterling*:

> The open operation of our courts is of utmost public importance. Justice must be conducted openly to foster the public's understanding and trust in our judicial system and to give judges the check of public scrutiny. Secrecy fosters mistrust.
>
> . . . .
>
> I write separately to respond to . . . [the] contention that some courtroom closures deserve no remedy because the violation is *de minimis*. I completely agree . . . that there may be a case, there may be many cases, where substantive justice to the parties was done behind locked doors. Defendants themselves might even want the courtrooms closed for many rational reasons. But whether or not the defendant got due process of law is a completely different question from whether our article I, section 10 was violated. While a defendant may not herself be harmed by a hearing in a closed courtroom, there is no case where the harm to the principle of openness, as enshrined in our state constitution, can properly be described as *de minimis*. Thus, I cannot agree that there could ever be a proper exception to the principle that a courtroom may be closed without a proper hearing and order.
>
> Our founders were smart. They knew that without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. . . . Judicial secrecy, however manifested, must be resisted.
>
> . . . .
>
> [T]he constitutional requirement that justice be administered openly is not just a right held by the defendant. It is a constitutional obligation of the courts. It is integral to our system of government. Open justice is just too important to our constitution and our state to allow us to look for

7

reasons to turn a blind eye to improperly locked courtroom doors. When the courtroom doors are locked without a proper prior analysis under *Orange* and *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995), the people deserve a new trial.

. . . .

I cannot accede to the correctness of the proposition intimated in that case,—that, if a public trial has not been accorded to the accused, the burden is upon him to show that actual injury has been suffered by a deprivation of his constitutional right. On the contrary, when he shows that his constitutional right has been violated, the law conclusively presumes that he has suffered an actual injury. I go further, and say that the whole body politic suffers an actual injury when a constitutional safeguard erected to protect the rights of citizens has been violated in the person of the humblest or meanest citizen of the state. The constitution does not stop to inquire of what the person has been accused, or what crime he has perpetrated; but it accords to all, without question, a fair, impartial, and public trial.

*Easterling*, 157 Wn.2d at 185-87 (Chambers, J., concurring) (emphasis added)

(internal citations and quotations omitted).

Under our constitution, an open courtroom stays open. A trial court does not ask spectators to rethink their presence.

_____
Fearing, J.

8