IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38178-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| EDGAR ALEJANDRO | ) | |
| CHAVEZ BELTRAN, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Edgar Chavez Beltran appeals his conviction for

murder in the second degree with a firearm enhancement. He challenges the sufficiency

of the State's evidence that the homicide was not justifiable. He also argues the trial

court violated his statutory and constitutional due process rights by imposing restitution

costs without a hearing. Alternatively, he argues he received ineffective assistance of

counsel due to counsel's failure to object to the restitution costs.

We conclude the State presented sufficient evidence to sustain Chavez Beltran's

conviction. To the extent he objects to restitution costs on a statutory basis, we deny

review of that unpreserved claim of error. To the extent he raises a due process

challenge, we conclude the claim of constitutional error is not manifest. Because

No. 38178-1-III
*State v. Chavez Beltran*

evidence from outside the record is necessary to review his ineffective assistance of

counsel claim, we do not review it.  Rather, his remedy, if he so chooses, is to file a

properly supported personal restraint petition.  We affirm his conviction.

FACTS

Edgar Chavez Beltran shot and killed his coworker, Leopoldo Parra Nuñez.[1]

The question at trial was whether the killing was justifiable.

*The shooting*

Parra Nuñez and Chavez Beltran were both seasonal workers at a potato farm near

Wallula, Washington.  Parra Nuñez drove a potato transport truck but because he got

along with his coworkers and was a good driver, he also was chosen to transport other

workers from the main office to the fields.  Chavez Beltran drove a tractor that was used

to pack down the dirt so the potato transport trucks would not get stuck.

On October 9, 2019, Chavez Beltran had been working at the farm for about one

and one-half to two months.  At the end of the day, Parra Nuñez picked up Chavez

Beltran first before picking up another driver.  During the time they were alone together

---

[1] The coworker's name is listed as "Leopoldo Nunez Parra" on the information charging Chavez Beltran.  There are a number of alternate spellings and orderings of the victim's surname in the record.  Victim impact statements indicate his surname was Parra Nuñez.  We refer to his surname as Parra Nuñez, consistent with the letters from his family.

2

in the truck, Chavez Beltran shot and killed Parra Nuñez. Chavez Beltran told a coworker that Parra Nuñez had tried to take his gun.

Chavez Beltran called 911 and told the dispatcher he had "just killed a guy who tried to pull my gun." Trial Ex. 29, at 2. He said he was in the car with Parra Nuñez, and "he tried to reach my gun, you know, and so I freak out, and I just go over him, you know, just—he didn't [stop]." *Id.* at 7. Chavez Beltran told the dispatcher that Parra Nuñez was dead: "I shot him, like, in the head, like a couple times, on the left eye . . . put his brain everywhere." *Id.* at 8. He told the dispatcher he and Parra Nuñez argued the other day and that Parra Nuñez "said some really weird things." *Id.* at 9.

### *Interview with Detective Daschofsky*

Detective Kristen Daschofsky of the Walla Walla County Sheriff's Office interviewed Chavez Beltran late on the night of the shooting, beginning at 11:23 p.m. and ending the next morning at 1:34 a.m.

Chavez Beltran reported having trouble with Parra Nuñez from the first day he arrived. He recalled an incident about three weeks before when Parra Nuñez had been trying to fix something in the field. He told Parra Nuñez he was doing it wrong and insisted that Parra Nuñez give him the hammer he was using. Chavez Beltran recalled

Parra Nuñez saying, "[O]h, you feel like you're smart," and Para getting "pissed."

Trial Ex. 32, at 53.

Chavez Beltran said other things happened the week before on October 3. When they returned to the office from the fields, Parra Nuñez "made some weird moves, like— like he wanted to pull something." *Id.* at 58. He showed the detective that Parra Nuñez appeared to be holding something by his side and described the moves as "where you want to take someone . . . down." *Id.* at 59. He said there were two other coworkers who "open[ed] the way" for Parra Nuñez, and he could not see it well, but Parra Nuñez had something shiny and Chavez Beltran thought it was a gun. *Id.* at 58. Chavez Beltran had once had a conversation about guns and Parra Nuñez told him he owned a gun and showed him a picture of his gun. The next day, he spoke to Parra Nuñez about what he thought he saw the day before, and Parra Nuñez got nervous. After this, Parra Nuñez would swear when he passed by him.

Chavez Beltran said he had started carrying a gun three or four months previously, when he worked at his prior job. He had had problems with persons he thought were gangsters. He had a concealed pistol license and carried the gun in a holster inside the right side of his waistband, covered by his shirt. His coworkers at the potato farm had seen his gun once when he was lying on the ground fixing a machine. According to

4

Chavez Beltran, Parra Nuñez and two other coworkers started talking about trying to take his gun.

After that, whenever Parra Nuñez came close to him, he believed Parra Nuñez was trying to get his gun, although he had not reached for the gun before the evening of the shooting. He believed Parra Nuñez was trying to intimidate him. Parra Nuñez told him things that made him think Parra Nuñez wanted to kill him. Parra Nuñez talked about videos with dead people and, once while driving on a bumpy road, Para told him that his head would blow off and his heart would rip out. He thought Parra Nuñez was nervous whenever the two rode together on the way back to the office. He said all his coworkers knew about the trouble between him and Parra Nuñez.

Chavez Beltran told the detective that after he got into the truck with Parra Nuñez that evening, he reached into his jacket to put away his cell phone, and Parra Nuñez reached toward him with his right hand, so Chavez Beltran pulled out his gun and shot him. He racked the slide of his gun, noticed a round ejected, and then continued firing. Parra Nuñez said, "'No.' But it was too late." *Id.* at 137. Parra Nuñez put his hands up in "some weird move, you know, like trying to stop [the bullets]." *Id.* at 140.

Chavez Beltran said Parra Nuñez "chose this" and, if Parra Nuñez had been quicker, it could have been him dead instead. *Id.* at 86. He acknowledged that Parra

5

Nuñez may have thought he was reaching for his gun when he put his cell phone in his jacket. He felt "nothing" about shooting Parra Nuñez. *Id.* at 178. He told the detective, "It's not normal, but that's what I—that's what I feel. I mean, I—I'm kind of worried, you know, but what can I do? I cannot bring him back." *Id.* at 179.

### *Trial*

The State charged Chavez Beltran with murder in the second degree with a firearm enhancement. At trial, in addition to hearing testimony from various witnesses, the jury heard the audio recording of Chavez Beltran's 911 call and watched the video recording of his interview with Detective Daschofsky.

#### *Farm employees*

The State called Luis Vergara, the field manager for the farm. Vergara put Parra Nuñez in charge of driving his coworkers to and from the fields because he got along "pretty good with everybody" and was one of the best drivers. Report of Proceedings (RP) (Feb. 24, 2021) at 36. Chavez Beltran started as a potato vine puller, but Vergara put him on the tractor since he was a good worker.

On October 9, after most of the workers were done for the day, Vergara told Parra Nuñez to go pick up Chavez Beltran and another truck driver in the field. Parra Nuñez got stuck in the dirt, however, and called Vergara to pull him out. After Parra Nuñez's

truck was freed, Vergara saw Parra Nuñez pick up Chavez Beltran. He saw Parra

Nuñez's truck drive about 100 yards and then stop like somebody was braking. He

thought the truck had gotten stuck again and went to help. He then saw Chavez Beltran

get out of the front passenger door with a gun in his hand. Vergara recalled:

> [Chavez Beltran] said . . . he tried to grab my gun. I said you're not
> supposed to have a gun at the farm. You know, this is not a place to have a
> gun. He said well, he tried to grab my gun, so I shot him. And I told him,
> what do you mean you shot him. Yeah. I said well, let's see how's he
> doing. He said no, he's dead. I killed him.

RP (Feb. 24, 2021) at 41. Vergara did not think that Chavez Beltran looked scared.

Vergara wanted to call an ambulance and Chavez Beltran wanted to call the police. After

speaking with the farm owner, Vergara left to help guide emergency services to the field.

Vergara usually would be told when one worker did not get along with another but

was not aware of any bad feelings between Chavez Beltran and Parra Nuñez. He never

saw anything that suggested they were having problems nor did either of them tell him

there were problems.

*Law enforcement witnesses*

Walla Walla County Sheriff's Office Chief Deputy Richard Schram testified that

when he responded to the shooting, he encountered Chavez Beltran walking down a field

road. He was compliant with directions given and appeared calm. He had blood on his

pants, but was not injured. After Chief Deputy Schram placed Chavez Beltran in custody, he inspected the truck. He saw Parra Nuñez in the driver's seat, slumped over toward the middle of the vehicle.

Deputy Jared Brown detained Chavez Beltran in his patrol car. He thought Chavez Beltran was unaffected by the shooting.

Deputy Kevan Maas testified the truck was running and still in drive when he arrived: "[T]he incline was enough that the vehicle couldn't continue up the hill, but it also wasn't going backwards because it was still in drive." RP (Feb. 24, 2021) at 87. He saw blood pooled underneath the driver's seat and seeping back toward the rear passenger seat floorboard. The driver's side window was broken.

Deputy Maas saw Parra Nuñez lying on his right side toward the passenger side of the truck. His feet and legs were down toward the gas and brake pedals. There was a hat lying on the floorboard of the passenger side that appeared to have fallen from Parra Nuñez's head.

Detective Daschofsky testified that when she arrived on scene and approached the truck, she saw the shattered driver's window and there was glass on the ground 20 feet behind the car. There were tire tracks from the truck extending in a straight line. The truck was a Ford F-550, "a larger truck." RP (Feb. 24, 2021) at 121. From the open front

8

passenger door, she saw Parra Nuñez slumped over to the right. She saw blood "pooling underneath the right side of his face and . . . going onto the backseat floorboard." RP (Feb. 24, 2021) at 122. Because the truck was on a hill, the blood went from the driver's side to the passenger side. She also saw blood spatter on the windshield. The detective saw a blue baseball hat, five shell casings, and one live round on the passenger side floorboard.

The detective described Chavez Beltran as taller than Parra Nuñez. She recalled that Chavez Beltran was wearing a gray button-up shirt with a gray T-shirt underneath and khaki pants. Based on this, she testified it would have been difficult for a driver, while driving a truck, to take a holstered gun away from someone wearing this type of clothing. There were no weapons found at the scene other than the gun and a knife belonging to Chavez Beltran. Her department had interviewed other workers at the farm and she was not aware of anyone who knew about problems between Chavez Beltran and Parra Nuñez, although she did not believe anybody had spoken with the two other men Chavez Beltran believed were involved in trying to take his gun.

### *State's forensic witnesses*

Mitchell Nessan, a forensic scientist with the Washington State Patrol, described seeing the broken driver's side window and the glass on the ground behind the truck. The

9

cracks in the window indicated either a bullet or bullet fragment had struck the glass. He explained that the glass on the ground indicated where the glass fell out the driver's door window, but he could not be sure whether that was where the bullet passed through the window or whether the truck traveled for some distance between the bullet breaking the window and the broken glass falling out. He estimated the glass was about 30 feet from the driver's window.

He also described Parra Nuñez's location, the bullet wounds, and the blood spatters and pooling. From the evidence, Nessan concluded that Parra Nuñez was "pretty much in front of the steering wheel and to the right" when he was shot. RP (Feb. 25, 2021) at 186. Because of the number of gunshots, he could not associate any individual gunshot with any individual bloodstain. He noted it was "a dynamic event in a very enclosed confined space. . . . I can't say exactly where the gun was in relationship to any of the bullet[s]." RP (Feb. 25, 2021) at 191. Because there were so many shots and no exit wounds, he did not have enough information to try and correlate where Chavez Beltran and Parra Nuñez were in relation to one another.

Brett Bromberg-Martin, also a forensic scientist for the Washington State Patrol, testified that he matched the bullet and shell casing found at the scene to Chavez Beltran's gun. He also tested the blue hat found in the truck, which had a bullet hole on

10

the front right side.  He determined that the muzzle of the gun was contacting or nearly

contacting the hat when the gun was fired.  He could not determine where the hat was

when the gun was fired, however.

Dr. Sigmund Menchel, the forensic pathologist who conducted the autopsy of

Parra Nuñez, testified that Parra Nuñez's cause of death was multiple gunshot wounds to

his head and torso.  He recovered nine bullets from the body as well as fragments of one

or more bullets, a number of which could have been fatal.  Dr. Menchel recorded 12

different bullet wounds: 4 on Parra Nuñez's chest, 2 on his shoulder, 2 on his neck, and

4 on his head and face.  The shots all had a downward trajectory and most were on the

right side of Parra Nuñez's body, traveling from right to left.  One head wound was on the

top of his head, traveling downward.  A second was on the right side of his face, traveling

right to left and downward.  A third was near his left eye, traveling left to right and

downward.  That shot exited and reentered Parra Nuñez's body, causing both wounds to

his neck.  The injuries to Parra Nuñez's face had gunpowder stippling, indicating the

shots were fired from a close distance.

Dr. Menchel opined that the gunshot wounds to the torso would cause

significant internal bleeding and would cause death within "a minute or two."

RP (Feb. 26, 2021) at 248.  The wounds to the head would cause death "obviously more

11

rapidly." RP (Feb. 26, 2021) at 248. He believed at least some of the gunshot wounds to the torso occurred before the wounds to the head because there was significant internal bleeding that would require the heart to be beating. The only bullets that could have instantly stopped Parra Nuñez moving were the wounds to his head. Dr. Menchel measured Parra Nuñez at five feet nine inches.

*Family members*

Chavez Beltran's parents both testified that their son had told them there was a coworker who did not like him. Parra Nuñez's mother similarly testified Parra Nuñez had told her he had a disagreement with a coworker. She testified that Parra Nuñez did not own a gun and had never used a firearm.

*Chavez Beltran*

Chavez Beltran testified in his defense at trial. He described his trouble with Parra Nuñez starting because he learned quickly and it seemed Parra Nuñez viewed him as competition. Parra Nuñez began telling him things that did not make sense and scared him, like the comment while on the bumpy road that his heart would rip out. Parra Nuñez would purposely bump into him when walking by.

He testified that on the day of the shooting he wanted to talk to Parra Nuñez about getting along better. He tried to approach Parra Nuñez in the morning, but Parra Nuñez

left before he could talk to him.  When he got into the truck that evening, Parra Nuñez

"seemed really nervous and his eyes were wide open."  RP (Feb. 26, 2021) at 291.  He

recalled thinking to himself that he needed "to stay calm and not make any aggressive

movements or anything."  RP (Feb. 26, 2021) at 293.  He described putting his phone in

his left jacket pocket.  Then Parra Nuñez

> reached for me. . . .  I grabbed myself here and then I pushed him with a lot
> of force, I pushed him back.  But he kept on coming towards me.  So, what
> I did is at that time my weapon was like halfway in the holster. . . .  I took it
> out and I put it between my legs . . . .  But he continued trying to like attack
> me and go for me and actually he hit me . . . .  I pushed him again and then I
> pulled the trigger and a bullet came out.  It was ready.  So, I saw that
> happened and then I pushed him again and then with my hand I tried to stop
> him . . . .  And then I did point my weapon, but not at him.  I had it pointed
> at the window.  He grabbed it like this and that's when I think that bullet . . .
> came out . . . .  Then everything was scary.  And I shot him twice . . . .  But
> he did not stop.  He did not stop coming towards me.  So, I was shooting
> and trying to defend myself like this.  I could tell that he was still trying to
> grab my weapon like this.  In the end, he was kind of like above me and
> then he had his hand on me . . . .  But by then I did not know where I was
> shooting . . . .

RP (Feb. 26, 2021) at 294.

Chavez Beltran recalled Parra Nuñez saying no when Parra Nuñez was holding

him from above.  He did not intend to shoot Parra Nuñez at first, but Parra Nuñez would

not calm down.  When he began shooting, he did not intend to kill Parra Nuñez.  If Parra

Nuñez had stopped attacking him, he would have stopped firing the gun.

Chavez Beltran described his two shirts covering his holster, but his jacket being open and nothing being on the seat between him and Parra Nuñez. He claimed that Parra Nuñez had actually gotten to his gun. Before, Parra Nuñez had just tried to bump into him, but that night was "the closest time" Parra Nuñez had gone for his gun. RP (Feb. 26, 2021) at 297. When asked, he said he was about six feet tall.

Chavez Beltran explained he had not told Detective Daschofsky of the struggle over the gun because he was "in a lot of shock" and his "mind was racing and very stressed." RP (Feb. 26, 2021) at 296. After he had a chance to think about things, he was able to recall better. He did not know how to explain things during the interview with the detective. He had been awake roughly 20 hours by the time of the interview and did not speak English perfectly.

### *Defense forensic witness*

Chavez Beltran called Marty Hayes, who was an expert in the fields of ballistics and the dynamics of violent encounters. Based on Dr. Menchel's autopsy report, Mr. Hayes recreated the paths of the bullets on a forensic mannequin, which he used as a demonstrative aid in the courtroom.

He opined that when Chavez Beltran shot Parra Nuñez, Parra Nuñez was leaning toward Chavez Beltran at a 45-degree angle, progressing to a 90-degree angle as the shots

14

were fired, indicating Parra Nuñez "was falling over as he was shot." RP (Mar. 1, 2021) at 383. He believed the shooting took two to four seconds based on the firing speed of the gun and the length of time it would take Parra Nuñez to fall. He opined: "Something had to be moving in order to create this pattern of shots. Either the shooter had to be moving the gun like so or the recipient would have had to be moving towards the gun being held horizontal." RP (Mar. 1, 2021) at 385. Mr. Hayes assumed that Chavez Beltran was holding the gun horizontally because there was no evidence he was moving the gun. Mr. Hayes believed that the gunshot near Parra Nuñez's eye was the last shot fired, while Parra Nuñez's head was down on the seat.

Mr. Hayes could not conclude that Parra Nuñez was reaching toward Chavez Beltran, only that Parra Nuñez was falling over. He did not find anything to suggest that Parra Nuñez was on top of Chavez Beltran during the shooting.

*Jury instructions and verdict*

In addition to the instruction on second degree murder, the jury was instructed on self-defense. The jury convicted Chavez Beltran of murder in the second degree and found the State had proved the firearm enhancement beyond a reasonable doubt.

15

*Sentencing*

Prior to sentencing, several victim impact statements were filed by Parra Nuñez's relatives and friends, as was Chavez Beltran's sentencing memorandum, and a presentence investigation report. At sentencing, the trial court considered those filings, in addition to hearing from Chavez Beltran, his mother, two of Parra Nuñez's relatives, and arguments of counsel. Neither counsel addressed the $4,395.79 figure listed as restitution in the legal financial obligation portion of the judgment and sentence.

The trial court sentenced Chavez Beltran to 232 months of confinement and 36 months of community custody. In addition, it ordered restitution in the amount of $4,395.79 to the Crime Victims Compensation Program of the Department of Labor and Industries.[2]

Mr. Chavez Beltran timely appealed.

---

[2] After Chavez Beltran filed his appellate brief, the State filed in the trial court a declaration from an employee of the prosecutor's office and directed the superior court clerk to file it with our court. The State then included these new "facts" in its appellate brief. This is an improper procedure for submitting additional evidence on review. RAP 9.11 outlines the proper procedure. We decline to consider the improper evidence.

ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE

Chavez Beltran contends the evidence was insufficient to prove the homicide was not justifiable.  We disagree.

In a challenge to the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt."  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  We draw all reasonable inferences in favor of the State and against the defendant.  *Id.*  "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  *Id.*  We defer to the jury on issues of witness credibility.  *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010).

When a defendant raises credible evidence, from whatever source, that the killing was justifiable, the State must then prove the absence of self-defense beyond a reasonable doubt.  *State v. Brightman*, 155 Wn.2d 506, 520, 122 P.3d 150 (2005).  Deadly force is justifiable where the slayer "reasonably fears the person slain is about to commit a felony upon the slayer or inflict death or great personal injury, and there is imminent danger that the felony or injury will be accomplished."  *Id.* at 520-21 (emphasis omitted).

17

Justification includes both subjective and objective elements: "Deadly force is necessary only where its use is objectively reasonable, considering the facts and circumstances as they were understood by the defendant at the time." *Id.* at 521.

Chavez Beltran argues the State failed to prove the absence of self-defense beyond a reasonable doubt because he had presented evidence of an ongoing argument and his fear that his gun would be used by Parra Nuñez to kill him.

Viewing the evidence in the light most favorable to the State, a rational trier of fact could disbelieve Chavez Beltran's testimony that Parra Nuñez went for his gun. First, the jury did not need to believe there was a struggle for the gun. Soon after the shooting, Chavez Beltran described the incident to Vergara, to the 911 operator, and to the detective. He told them that Parra Nuñez had reached for his gun, so he shot him. He did not describe a struggle for the gun until he testified at trial. In addition, the objective evidence is inconsistent with Chavez Beltran's testimony. If there was a struggle for the gun, the truck would not have continued to be driven in a straight line.

Second, the jury did not need to believe that Parra Nuñez even reached for the gun, at least not until Chavez Beltran started firing it. This is because it would have been nearly impossible for the smaller man to reach across the width of the large truck while driving and successfully take the gun, holstered on Chavez Beltran's right hip, under his

18

buttoned shirt. Such an attempt almost certainly would have been unsuccessful and it would have exposed Parra Nuñez to being shot. A rational trier of fact could have found that Parra Nuñez would not have attempted something nearly impossible while risking death or serious injury.

Third, Chavez Beltran's argument fails to address the objective reasonableness of his decision to use deadly force. Even if Parra Nuñez had reached to his right, it would have been nearly impossible for the smaller man to reach across the width of the large truck while driving, and successfully take the holstered gun. Attempting to account for this, Chavez Beltran testified at trial that he took his gun from the right holster and placed it between his legs (closer to Parra Nuñez's reach). This testimony, too, was not required to be believed. Chavez Beltran never told the detective this. A rational trier of fact could have disbelieved almost everything Chavez Beltran said, except that Parra Nuñez reached to defend himself after Chavez Beltran drew his gun, which would explain why he was slumped over toward the right.

We conclude the State presented sufficient evidence from which a rational trier of fact could have found Chavez Beltran guilty of murder in the second degree.

19

B.      VIOLATION OF STATUTORY AND CONSTITUTIONAL PROTECTIONS WHEN
        IMPOSING RESTITUTION

*1.      Statutory violation*

Chavez Beltran argues the trial court violated RCW 9.94A.753(7) when it imposed

restitution without holding a restitution hearing.  The State responds that we should

decline to review this claim of error because it was not raised below.  We agree.

We generally decline to review a claim of error that was not raised in the trial

court.  RAP 2.5(a).  The rule reflects a policy encouraging efficient use of judicial

resources.  We will not sanction a party's failure to point out at trial an error that the trial

court, if given the opportunity, might have been able to correct to avoid an appeal.

*State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988).

*2.      Constitutional violation*

Chavez Beltran argues the trial court violated his constitutional right to due

process when it imposed restitution without presenting evidence to justify the restitution

award.

RAP 2.5(a) permits review of an unpreserved claim of error if it is manifest and

affects a constitutional right.  RAP 2.5(a)(3).  "Manifest," as used in RAP 2.5(a)(3),

requires a showing of actual prejudice.  *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d

125 (2007).  To demonstrate actual prejudice, there must be a plausible showing by the

appellant that the asserted error had practical and identifiable consequences. *Id.* "If the trial record is insufficient to determine the merits of the constitutional claim, the error is not manifest and review is not warranted." *Id.*

RCW 9.94A.753(7) directs trial courts to order restitution "in all cases where the victim is entitled to benefits under the crime victims' compensation act, chapter 7.68 RCW." Here, because Chavez Beltran did not object to the restitution, the record is insufficient to determine if he was prejudiced by its imposition. As discussed below, he is not without a remedy.

C.      INEFFECTIVE ASSISTANCE OF COUNSEL

Chavez Beltran contends trial counsel was constitutionally ineffective for failing to object to restitution. We have insufficient facts to rule on this contention.

We review a claim of ineffective assistance of counsel de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance claim, the defendant must meet the two-pronged *Strickland*[3] test and show (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *Id.* at 457-58.

---

[3] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

"Deficient performance is performance falling 'below an objective standard of reasonableness based on a consideration of all the circumstances.'" *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). A reviewing court starts from "a strong presumption that counsel's performance was reasonable." *Id.* If counsel's performance was deficient, a defendant must also show there was a reasonable probability of a different outcome had counsel's performance been adequate. *Id.*

Here, defense counsel did not object to the ordered restitution. The facts are insufficient for us to determine whether this failure was due to deficient performance and whether it was prejudicial.

At sentencing, defense counsel was focused on arguing that his client should be sentenced to well below the standard range. If the restitution was proper, both as to the payee and the amount, there would be no reason to comment on it during the sentencing hearing. On the other hand, if the restitution amount was improper, either as to the payee or the amount, an objection should have been raised. Nothing in the record helps us determine if reimbursement should have been challenged.

No. 38178-1-III
*State v. Chavez Beltran*

Chavez Beltran must fill this evidentiary gap with evidence outside the trial court record. His remedy is to file a properly supported personal restraint petition. *McFarland,* 127 Wn.2d at 335.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Siddoway, C.J.                                           Pennell, J.

23