IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>               Respondent,<br><br>v.<br><br>MERLE CHARLES BUCHANAN,<br><br>               Appellant. | No. 82987-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Merle Charles Buchanan challenges his conviction for two counts of murder in the second degree for the killings of Paul Tapia and Jose Garcia. Buchanan asserted self-defense at trial. Buchanan now appeals, arguing the trial court erred in refusing to instruct the jury on justifiable homicide in resistance to a felony in addition to justifiable homicide in self-defense and argues the trial court erred in giving a "first aggressor instruction." And finally, he argues that the prosecutor committed misconduct by misstating the law regarding "first aggressor" in closing argument at trial. Finding no error, we affirm.

FACTS

Early in the morning on January 6, 2018, Paul Tapia and Jose Garcia were shot at close range by Merle Charles Buchanan in the parking lot of the Taradise Café bar in White Center. Garcia died at the scene, while Tapia died at

Citations and pin cites are based on the Westlaw online version of the cited material

a hospital a short time later. The bar had security cameras that captured video of the interior, the bar, the front door, and the parking lot that night. The shooting occurred next to Buchanan's car that was parked in between other vehicles and was captured on security video. The video did not include any audio and the only testimony as to what was said during the interaction came from Buchanan, who testified at trial. Police had no contact with Buchanan until he turned himself in to police about two months later.

Events began on January 5, 2018. Prior to arriving at Taradise, Tapia and Garcia, already intoxicated, stopped at a convenience store and met a third man, Poe Time. The men invited Time to join them. Tapia drove the group from the convenience store to a country bar in Burien. They were kicked out of the country bar after Tapia was "aggressive" and "energetic" toward other patrons and with security. The three then continued on to Taradise.

Tapia, Garcia, and Time arrived at 12:27 a.m. Minutes after entering, Tapia bumped into a bar employee, causing him to break a glass. Tapia was then escorted out of the bar. Tapia gestured with his arms while talking to the employee and security near the door.

Two security guards followed Tapia out the door and talked to him for several minutes. Tapia continued to gesture with his arms while they conversed. Tapia stayed outside for the remainder of the evening.

Buchanan entered the bar at 11:22 p.m. Buchanan and Tapia never interacted inside the bar. Buchanan left the bar while talking on his cell phone at 12:37 a.m., at the same time Tapia spoke with the security guard outside the

2

door. Buchanan observed Tapia's interaction with the security guard. Buchanan stood near Tapia and the security guard while smoking a cigarette. Buchanan reached over and shook Tapia's hand. Tapia smoked a cigarette and the two conversed. The interaction was calm and Tapia often gestured by raising his arms while he spoke. Buchanan testified that they chatted about various topics such as sports and how their days were going. Garcia exited the bar and joined Tapia and Buchanan in conversation. At 12:46 a.m., Buchanan, Tapia, and Garcia all headed toward the parking lot. All three appeared to walk in an unsteady fashion. Tests performed during autopsy showed that Tapia had a blood-alcohol content of .18 and Garcia had a blood-alcohol content of .25. Buchanan testified that he had a "small buzz" but was not intoxicated.

Buchanan walked through the Taradise parking lot with Tapia and Garcia. Buchanan walked toward Buchanan's car and Tapia and Garcia followed. Buchanan said that he was planning to go out to his car in the parking lot to "relax for awhile." They talked while walking without any hostility. Buchanan sat in the driver's seat of his car leaving the door open with Tapia at his open door. For approximately nine minutes, while Buchanan was inside his car, Tapia remained by the open door. Tapia did not remain standing up but his exact body position cannot be seen on the security video. Buchanan, at trial, described Tapia as "[k]ind of leaning inside my door." Buchanan could not remember if Tapia was squatting or "just kind of leaned over."

3

Buchanan testified that he had a plastic bag with "nuggets" of cannabis[1] worth about $100 sitting in an area to his right near the center console. At trial, Buchanan explained that a nugget is a clump of cannabis. Buchanan said he smoked a cigarette and began to "roll a blunt" of cannabis. Tapia said it smelled good and wanted to smoke with Buchanan. Tapia wanted to smell it so Buchanan handed him a "nugget to smell" and Buchanan continued rolling his blunt. After about a minute or so, Buchanan realized Tapia had not handed the nugget back so Buchanan asked where it was. Buchanan testified that Tapia "told me, he said, what weed? That's my weed. And he said matter of fact you have the rest of my weed right there. Give it here." Buchanan said, "[h]e basically informed me that it wasn't my weed. It was his weed, and he was going to take the rest of my weed too," and that Buchanan told him "no, you are not." Buchanan testified that Tapia started to "act like he was going to – like he was going to forcefully take it from me." Buchanan's description of Tapia's actions at this stage was limited to Tapia leaning over or squatting while at the open door and stepping back when Buchanan later got out of the car.

When Buchanan and Tapia were first at the driver's side door, Garcia meandered around the parking lot, but eventually returned to Buchanan's car. Garcia walked around the passenger side of Buchanan's car and eventually stood near the front of the driver's side of Buchanan's car.

---

[1] Though trial testimony referred to the substance as "marijuana," we decline to use the term here outside of a direct quote. The Washington State Legislature, in adopting legislation to replace the term "marijuana" in the Revised Code of Washington, recently found that the term has "discriminatory origins." LAWS OF 2022, ch. 16, § 1. The Legislature will instead replace it with the "more scientifically accurate term 'cannabis.'" Id. We adopt this terminology.

Buchanan testified that after the disagreement about the cannabis, "I believe – I tried to – I tried to talk the situation down. Tried not to make it more hostile when I realize what was going on over there. At that point I decided to get out of my car because I feel like I'm trapped. He is standing in my door, and I can't close my car door. So I decided to get out of my car." As he got out of the car, Buchanan grabbed the gun he stored between the driver's seat and center console and put it in his right jacket pocket. Buchanan testified that Tapia backed up so that Buchanan could get out of his car.

At 12:56, Tapia stood up, still positioned next to Buchanan's open driver's side door. A few seconds later, Buchanan got out of the vehicle and faced Tapia. Buchanan testified, "I step out of my car. I kind of got in an argument, but I'm trying to calm it down, and trying to convince him to give me my stuff back and leave me alone. Basically walk away from me, and leave the situation alone, and it started to get more heated." At trial Buchanan could not remember what each of them said, but recalled that he said something to the effect of being armed, that he would defend himself, and not to come closer.

Garcia remained standing near the front of Buchanan's car, leaning on the vehicle parked next to it. Both Buchanan and Tapia gestured with their arms as they spoke. At 12:58, Tapia handed something to Garcia over the open car door. The video does not clearly show the object, but Garcia took it in his right hand then moved it toward his left hand, holding the object with both hands. Garcia then placed both hands in the front pockets of his pants. Buchanan testified that he observed Tapia hand the bud of cannabis to Garcia.

While arguing, Buchanan said Tapia "balled his fists, and started to [sic] moving his farm [sic] like he was going to swing at me." Buchanan conceded that he "didn't give [Tapia] a chance" to strike him because he got so close to Tapia he could not put any momentum behind a swing. Buchanan "kind of lunge[d] forward and push[ed] him back." Before Buchanan pushed Tapia back, Tapia raised his arms gesturing while talking as he had earlier in the evening, including with Buchanan by the door to the bar. Tapia gestured with his arms in this manner multiple times before Buchanan pushed Tapia, temporarily pinning him against the adjacent car before Buchanan moved past him and stood closer toward the back end of his car.

Buchanan said Tapia then told Buchanan he would "beat the shit out of" and "kill" him. Buchanan then noticed that Garcia, who had been standing nearby, stepped forward and closed the driver's door to Buchanan's car. Buchanan removed his gun from his jacket pocket and held it in his right hand at his side, pointed at the ground.

At 12:59 a.m. three women exited the bar and walked past the passenger side of Buchanan's vehicle and within feet of Buchanan, Tapia, and Garcia. Two of the women, Virginia Arredondo and Krista Javalera, observed the three men together but did not see or hear any fighting. Javalera testified that, while she did not pay much attention to the three men as they walked past, she did not hear any arguing or threats and did not see any physical fighting. Javalera stated that had she observed any fighting or heard an argument, she would not have walked past the group of men. Arredondo testified that while passing Buchanan's

6

vehicle, she heard arguing but was not alarmed. Arredondo did not see Tapia or Garcia touch Buchanan. The women reached Arredondo's car, which was parked in the next row of parked cars behind Buchanan's car.

Arredondo stood near the trunk of her car, then looked up and saw Buchanan holding a gun. Arredondo described Buchanan as appearing very calm and standing in one spot. Arrendondo then looked over to Javalera in "a point of panic" when she heard gunshots and dropped to the ground. At 1:00 a.m. Buchanan raised his arm, fired, and Tapia fell to the ground. Garcia fell to the ground immediately after.

Buchanan said before he fired his gun he saw Tapia reach toward Tapia's right side and "didn't know if he was reaching for a weapon or what" and Buchanan just "reacted." Buchanan fired his gun two or three times, then stepped over the two men on the ground and got into his car where he sat for about 30 seconds before driving away.

After Buchanan drove away, a number of people began to immediately assemble around Tapia and Garcia, including Time. Time can be seen on video hovering near, standing over, and touching both Tapia and Garcia. Before performing an autopsy, the medical examiner cataloged the property and clothing found on Garcia. No cannabis was found on Garcia's person or in his property. Police later discovered that Time had Tapia's cell phone. Time testified that he did not remember how he obtained Tapia's phone but said it was "possible" that he took it from the scene.

Tapia was transported to Haborview Medical Center and later died of a gunshot wound to his head. Garcia died at the scene of a gunshot wound to his head. Detectives identified Buchanan as the shooter during their investigation but were unable to locate him until he turned himself into police about two months after the shooting.

Buchanan was charged with two counts of murder in the second degree and one count of unlawful possession of a firearm in the second degree. The case first proceeded to a jury trial in May 2021 on the murder charges.[2]

Jury Instructions

At trial, Buchanan objected to the trial court not instructing the jury that a "[h]omicide is justifiable when committed in the actual resistance of an attempt to commit a felony upon the slayer"[3] and the court giving a first aggressor instruction. In support of his proposed instruction, Buchanan argued that the evidence supported a defense theory that Buchanan had killed the two men while resisting felony robbery, theft in the second degree, or attempted assault in the second degree. The state objected, arguing that the evidence did not show Buchanan shot Tapia and Garcia to resist the commission of a felony. At most, the State argued, Buchanan's testimony showed he used his gun because he believed Tapia was reaching for a weapon and Garcia was backing him up.

---

[2] The count of unlawful possession of a firearm in the second degree was bifurcated and Buchanan was later found guilty by the trial court after a stipulated facts trial following jury trial. That conviction is not at issue in this appeal.

[3] Though Buchanan proposed actual numbered jury instructions, those instructions are not in the record.

After questioning Buchanan as to what evidence supported the felonies he claimed to resist, the court denied his request and instructed the jury on justifiable homicide. Instruction 32 provided:

It is a defense to a charge of murder and manslaughter that the homicide was justifiable as defined in this instruction.

Homicide is justifiable when committed in the lawful defense of the slayer when:

(1) the slayer reasonably believed that the person slain, or others whom the defendant reasonably believed were acting in concert with the person slain, intended to inflict death or great personal injury;

(2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and

(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

Buchanan also objected to the trial court granting the State's request for a first aggressor instruction. Instruction 36 provided:

No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

In closing argument, the State began by telling the jury that

[Tapia and Garcia] never appeared to be afraid of the defendant the whole time they were at his car. And that's because

9

the defendant's decision to initiate a physical confrontation, to arm himself and to shoot each of them in the head wasn't foreseeable because it wasn't reasonable. It wasn't necessary. It wasn't justifiable under these circumstances. Mr. Tapia and Mr. Garcia couldn't see it coming because it wasn't a logical outcome to what was going on. It wasn't the necessary outcome. It wasn't justifiable homicide.

> The evidence in this case proves beyond a reasonable doubt that the defendant shot and killed Paul Tapia and Jose Garcia for no good reason. That is why he is guilty of murder. The evidence proves that he started it, and if he started it he can't claim self-defense.

The prosecutor went on to clarify where the jury should find the law.

> If I say something this morning about the law, and it doesn't seem to be what is in here, the Court's jury instructions, you go with the law that Judge Roberts gives you, and the same goes for whatever [defense counsel] says because you decide the facts, and you apply the law that Judge Roberts has given you to decide this case.

The prosecutor then explained its theory of the case and how the jury should apply the law to the facts stating,

> Okay. Here's the questions you have to answer. Did the State through the evidence prove the elements of intentional murder which is 1A and 2A beyond a reasonable doubt? Did the State through the evidence prove the elements of felony murder 1B, 2B beyond a reasonable doubt? Did the state through the evidence prove that the defendant was the first aggressor in this altercation that resulted in the death of Garcia and Tapia? And if the defendant is not the first aggressor, if the State fails to prove that beyond a reasonable doubt, then you decided whether his killing of Mr. Garcia was justified, and whether his killing of Mr. Tapia was justified. Those are all separate questions.

The defense objected to this as a misstatement of the law and the trial court overruled the objection. The State went on to say,

> Next question. Was the defendant the aggressor? Jury instruction 36. No person by any intentional act, done on purpose, reasonably, likely foreseeably, makes sense that what I'm doing might cause this situation, provoked, reasonably likely to provoke a

10

threat upon create a necessity for acting in self defense and the kill. So you can't start a fight, require somebody that you are fighting with to defend themselves, and then say oh gosh, no I got to defend myself against the guy that was defending himself against me. You can't do that. Law says you can't do that. Logical. It makes sense. If you find the defendant started the fight, and he created the situation that caused Mr. Tapia to react, and then he can't sit here and say – he can't claim that his shooting of them was justifiable because he started it. He created the situation that then he had to defend himself.

So if the evidence, and we will go through that in a second, proves beyond a reasonable doubt that he started it, then you don't have to look at justifiable homicide because he doesn't get that.

Now, if you find that it hasn't been proved beyond a reasonable doubt, that the State hasn't proven that he is the first aggressor, then you go to the justifiable homicide instruction, which is again full of reasonableness. The State has to prove the absence of this beyond a reasonable doubt. I know that's weird, but that is the law. So the State has to prove through the evidence that Mr. Buchanan believed that Tapia and Garcia were going to hurt him. Were going to kill him or inflict great personal injury. Not just hurt him. State has to prove that that's not reasonable. State has to prove that the harm wasn't imminent or the State has to prove that the force was too much.

If any of these are not present, then the state has proven that it's not justifiable. I know. Not the best way to write anything, but it is justifiable if all three things are there. So if the State proves one of them isn't there, then it's not justifiable. We will go through that. Okay.

In support of the argument that Buchanan was the aggressor and the shooting was unjustified, the prosecution argued that Buchanan initiated the altercation:

The defendant is the aggressor. He goes hands on. And anything Mr. Tapia did after that was Mr. Tapia defending himself. And the defendant can't then claim I caused Mr. Tapia to have to defend himself and now I got to kill him. So if you find beyond a reasonable doubt that the defendant's the first aggressor then that's it. If you don't, then you go through the jury instruction bit by bit for justifiable homicide.

11

The prosecutor continued to argue that Buchanan was the aggressor.

> So the defendant who started this fight by getting out of that car, going hands on, arming himself now claims that he had to kill these two men, and that he had no other choice.
>
> . . . .
>
> Tapia's waving his arms. Talking to the defendant. Garcia's not concerned. Just standing there. Tapia never strikes. Garcia never strikes. No one attacks the defendant. And the defendant gets what? Mad? Mad. And attacks them. And pushes him. And creates a situation where he is starting a fight.

The jury convicted Buchanan of both counts of murder in the second degree. Following his convictions, Buchanan moved for a new trial. The court denied the motion. Buchanan was subsequently sentenced to a total of 377 months' imprisonment for all three charges. Buchanan appeals.

DISCUSSION

Jury Instructions

A.  *Justifiable Homicide*

Buchanan asserts that the trial court erred in refusing to instruct the jury on justifiable homicide in resistance to a felony or attempt to commit a felony.[4]

---

[4] Because the record does not include the actual proposed jury instruction at issue, it is unclear if Buchanan's proposed instruction mirrored Washington pattern criminal jury instruction WPIC 1603:

> It is a defense to a charge of [murder] [manslaughter] that the homicide was justifiable as defined in this instruction.

> Homicide is justifiable when committed in the actual resistance of an attempt to commit a felony [upon the slayer] [in the presence of the slayer] [or] [upon or in a dwelling or other place of abode in which the slayer is present].

> The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they

Buchanan argues that Tapia was attempting to rob him of his cannabis and shot him to resist that robbery.[5]

Not all robberies justify the use of deadly force.  State v. Brightman, 155 Wn.2d 506, 519, 122 P.3d 150 (2005).  A killing in self-defense is not justified unless the attack on the defendant's person threatens life or great bodily harm. State v. Nyland, 47 Wn.2d 240, 243, 287 P.2d 345 (1955).

An instruction is proper if it correctly states the law, is not misleading, and permits counsel to argue his or her theory of the case.  State v. Mark, 94 Wn.2d 520, 526, 618 P.2d 73 (1980).  "Where a trial court has refused to give a justifiable homicide or self-defense instruction, the standard of review depends upon why the trial court did so."  Brightman, 155 Wn.2d at 519 (citing State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998)).  Where the trial court's refusal is based on a factual dispute, then it is reviewable only for abuse of discretion.  Id.  It is not error to refuse to give a cumulative instruction or one collateral to or repetitious of instructions already given.  State v. Benn, 120

---

reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to [him] [her] at the time [and prior to] the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02 (5th ed. 2021) (WPIC).

[5] Buchanan does not re-raise on appeal his argument that the felonies also were attempted assault in the second degree and theft in the first degree.

Wn.2d 631, 655, 845 P.2d 289 (1993) (citing State v. Hawkins, 70 Wn.2d 697, 708-09, 425 P.2d 390 (1967)).

Though the trial court did not explicitly state why it denied Buchanan's proposed jury instruction, the record shows that the court inquired extensively about whether the evidence factually supported such an instruction. The State argued that "the sequence of events is that the threat to kill was not related to the taking of marijuana or the assertion of that." The court responded, "I appreciate that because that was in my mind" and "that currently is what is giving me pause with regard to the current state of the instructions." The court then stated it would review the transcript of Buchanan's testimony. The next day, the court heard extensive arguments about the evidence. Because the record shows the court's refusal to give Buchanan's proposed instruction was based on a factual dispute, we apply an abuse of discretion standard of review.

We find that the trial court did not abuse its discretion in refusing to instruct the jury on justifiable homicide in resistance to a felony as the evidence did not support a finding that Buchanan was in fact resisting a robbery when he shot Tapia and Garcia.

> A person commits robbery when he
>
> unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person . . . . Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking[.]

RCW 9A.56.190. The force used does not have to be contemporaneous with the taking and may occur later in retention of the property taken. State v. Johnson,

155 Wn.2d 609, 611, 121 P.3d 91 (2005); State v. Handburgh, 119 Wn.2d 284, 830 P.2d 641 (1992) (affirming robbery conviction when victim saw the defendant riding her bicycle, demanded its return and a fistfight ensued).

The evidence did not support that Tapia used force or threatened to use force to take or retain Buchanan's cannabis. Tapia said he was going to take the rest of Buchanan's cannabis and that he was acting like he was "*going to* forcefully take it." (Emphasis added.) Other than making this statement, Tapia did not exhibit any force or threatened the use of force to try and take the plastic bag of cannabis. Buchanan testified that he gave Tapia a nugget of cannabis to smell and that Tapia gave the nugget to Garcia. Buchanan stepped out of his car and got in an argument while trying to get the cannabis "back." Buchanan testified that he lunged at Tapia after Tapia "balled his fists, and started to [sic] moving his farm [sic] like he was going to swing at me." Buchanan could not remember what either he or Tapia said at this time. However, the video showed Tapia moving his arms gesturing not unlike he did when previously conversing with Buchanan. And Tapia did this repeatedly before Buchanan reacted. Buchanan admitted that Tapia never had a chance to strike him or even get momentum to swing because Buchanan got close to Tapia. The video evidence shows that Buchanan is the one who initiated force against Tapia. Though Buchanan testified that Tapia told him he would "beat the shit out of" him and "kill" him, that happened only after Buchanan shoved Tapia and without any reference to the cannabis. The record did not establish that Buchanan's use of lethal force was in resistance to the felony of robbery.

15

Buchanan also contends that where a person defends themselves in resistance of a felony being committed against them, "once the felony has begun, the law does not require the person fear death or great bodily injury" in order for a homicide to be justifiable. Buchanan largely relies on the language in RCW 9A.16.050, Washington's justifiable homicide statute, which reads:

Homicide is also justifiable when committed either:

(1) In the lawful defense of the slayer, ... when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer ... and there is imminent danger of that design being accomplished; or

(2) In the actual resistance of an attempt to commit a felony upon the slayer . . . .

Buchanan repeats the same argument that the Washington Supreme Court addressed in Brightman. In Brightman, the defendant similarly argued, "that whenever the defendant can present evidence that a robbery was being attempted or was already in progress when the defendant acted in self-defense, then the defendant need not show that he or she feared death or great bodily injury to justify deadly force." 155 Wn.2d at 521. However, our Supreme Court observed "the Nyland, Griffith, Brenner, and Castro cases support a conclusion that a justifiable homicide instruction based on either .050(1) or .050(2) depends upon a showing that the use of deadly force was necessary under the circumstances." Brightman, 155 Wn.2d at 523 (citing Nyland, 47 Wn.2d at 242; State v. Griffith, 81 Wn.2d 572, 576-77, 589 P.2d 799 (1979); State v. Brenner, 53 Wn. App. 367, 377, 768 P.2d 509 (1989), overruled on other grounds by State

16

v. Wentz, 149 Wn.2d 342, 68 P.3d 282 (2003); and State v. Castro, 30 Wn. App. 586, 588-89, 636 P.2d 1099 (1981)).

"The trial court must view the evidence from the standpoint of a 'reasonably prudent person who knows all the defendant knows and sees all the defendant sees.'" Brightman, 155 Wn.2d at 520 (quoting State v. Read, 147 Wn.2d 238, 242, 53 P.3d 26 (2002)).

Buchanan testified he shot Tapia after Tapia said he would "beat the shit out of" Buchanan and "kill" him and reached toward his right side, causing Buchanan to believe he was reaching for a weapon. Instruction 32 allowed Buchanan to argue that the homicide was justified because he reasonably believed Tapia and his friend Garcia intended to inflict death or great personal injury to Buchanan, that Buchanan reasonably believed that there was imminent danger of such harm being accomplished, and that Buchanan employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to Buchanan, taking into consideration all the facts and circumstances as they appeared to Buchanan at the time of and prior to the incident.

Given this record, the trial court did not abuse its discretion in denying Buchanan's proposed instruction on self-defense in resistance of a felony.

*B. First Aggressor Instruction*

Buchanan next asserts that the trial court erred in giving the jury a "first aggressor" instruction. Buchanan contends this instruction was not supported by

17

the evidence. We disagree and find the evidence supported giving the instruction.

Whether the State produced sufficient evidence to justify a first aggressor instruction is a question of law reviewed de novo. State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948 (2011). "Words alone do not constitute sufficient provocation" for a first aggressor instruction. State v. Riley, 137 Wn.2d 904, 911, 976 P.2d 624 (1999). Additionally, the provoking act cannot be the actual assault charged. Bea, 162 Wn. App. at 577; State v. Kidd, 57 Wn. App. 95, 100, 786 P.2d 847 (1990).

Buchanan asserts that "words alone can constitute a threat of bodily harm even without any mention of a threat" relying on State v. Farnsworth to support the proposition. 185 Wn.2d 768, 777, 374 P.3d 1152 (2014). However, the Farnsworth court held only that where a person attempting to commit a bank robbery passed a note to the teller demanding money but containing no explicit threats of bodily harm, that, objectively, "a reasonable person in the teller's position could reasonably infer a threat of bodily harm." Farnsworth, 185 Wn.2d at 777. Farnsworth is inapposite.

An aggressor forfeits the right of self-defense. State v. Craig, 82 Wn.2d 777, 783, 514 P.2d 151 (1973). A "first aggressor" instruction explains to the jury that the State may disprove self-defense "by proving beyond a reasonable doubt that the defendant provoked the need to act in self-defense." State v. Grott, 195 Wn.2d 256, 268, 458 P.3d 750 (2020). The aggressor cannot claim self-defense "because 'the aggressor's victim, defending himself against the aggressor, is

using lawful, not unlawful, force; and the force defended against must be unlawful force, for self-defense.'" Riley, 137 Wn.2d at 911 (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.7(e) at 657-58 (1986)). A "first aggressor" instruction is appropriate, "[w]here there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense." Riley, 137 Wn.2d at 909-10. Such an instruction is also appropriate where there is conflicting evidence as to whether the defendant's conduct precipitated a fight. State v. Wingate, 155 Wn.2d 817, 823, 122 P.3d 908 (2005).

The trial court did not err in concluding that the first aggressor instruction was justified by the evidence. Buchanan testified that Tapia "balled his fists" and moved his arm in a way that made Buchanan believe Tapia was going to hit him. But the security video showed Tapia gesturing with his arms similarly to how he gestured while talking earlier with others, including Buchanan. It also showed Tapia move his arms multiple times before Buchanan pushed him back into the adjacent parked car. It was after this incident that Tapia said he would "beat the shit out of" Buchanan and would "kill" him.

The State also presented witness testimony that while the men appeared to be in an argument, they did not hear any threats and did not observe any physical escalation of the argument. The women testified that they were not alarmed by the men's argument and did not fear for their safety, or they would not have walked so close to them. Arredondo testified that Buchanan appeared

19

very calm and was standing in one spot before she saw him shoot Tapia and Garcia.

The only action Garcia took before being shot was to close the driver's side door after the shoving incident and stand behind Tapia.

The evidence supported a first aggressor instruction and the trial court did not err in so instructing the jury.

### Prosecutorial Misconduct

Buchanan contends that the prosecution committed misconduct in closing argument by telling the jury to first consider whether Buchanan was the first aggressor in the altercation, and if they found he was not, then to consider whether the killings were justifiable. We disagree with Buchanan's interpretation of the argument and find that the closing argument did not misstate the law.

A prosecutor "commits misconduct by misstating the law." State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 286 (2015). Prosecutors, however, have "'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting State v. Gregory, 158 Wn.2d 759, 147 P.3d 1201 (2006), overruled in part on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014)). "Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail on a claim of prosecutorial misconduct, a defendant must show that "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and

20

prejudicial." In re Pers. Restraint of Glasmann, 175 Wn.2d at 704.

Once a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

We review the prosecutor's conduct and whether prejudice resulted from it "by examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). In the full trial context, the argument was not a misstatement of the law, but an argument based on the evidence.

Rather than arguing that Buchanan was the first aggressor and created the need to act in self-defense against a secondary aggressor, the record reflects that the State's argument was that Buchanan was the *only* aggressor in this situation. The State's argument is that this is simply not a case of self-defense. At the beginning of closing argument, the State argued that Buchanan's decision to "shoot each of them in the head wasn't foreseeable because it wasn't reasonable. It wasn't necessary . . . It wasn't justifiable homicide." The prosecutor also pointed out that "Tapia never strikes. Garcia never strikes. No

one attacks the defendant," but the defendant "attacks them. And pushes him. And creates a situation where he is starting a fight."

Additionally, the State never told the jury not to follow the judge's instructions and never implied that the State did not have the burden to prove that the murders were unjustified. Instead, the prosecutor told the jury to defer to the Court's instructions on the law and that "you apply the law that Judge Roberts has given you to decide this case." The State's closing also correctly told the jury the burden was on the State to show that the killings were not justified and that they would have to prove so beyond a reasonable doubt.

The prosecution's theory of the case was that the jury need not look to whether it was justifiable under self-defense because this case was not a case of self-defense. The prosecutions closing argument, though perhaps inartful, simply articulated that theory and was not a misstatement of the law. Also, even if the prosecutor's statement was improper, Buchanan failed to demonstrate the requisite prejudice. He is therefore not entitled to a new trial. Emery, 174 Wn.2d 766 (holding that where there was one error, defendant failed to demonstrate the requisite prejudice and is not entitled to a new trial).

CONCLUSION

We affirm.

_____Cohen, J._____

WE CONCUR:

_____Mann, J._____     _____Andrus, C.J._____

22